# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JOSEPH MARINELLI.,** | Civil Action No. |
| Plaintiff, | |
| v. | |
| **MEDCO HEALTH SOLUTIONS, INC, d/b/a EXPRESS SCRIPTS, INC.,** | February 13, 2013 |
| Defendant. | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendant Medco Health Solutions, Inc. d/b/a Express Scripts Holding Company (improperly named as Medco Health Solutions, Inc. d/b/a as Express Scripts, Inc.) by way of its attorneys, Littler Mendelson, P.C., as and for its Answer, Affirmative Defenses, and Counterclaim to the Complaint filed by Joseph Marinelli (Marinelli) states as follows:

### NATURE OF THE ACTION

1.      With respect to the allegations contained in paragraph 1, Defendant admits that Plaintiff brings a declaration judgment action but denies that he is entitled to any relief thereunder.  Defendant admits that until January, 18, 2013 Plaintiff was employed by Medco Health Services, Inc. ("Medco") a wholly owned subsidiary of Medco Health Solutions, Inc. as Senior Director, Medicare Operations.  Defendant admits that when Plaintiff notified it that he intended to accept a position with Coventry Health Care, Medco specifically advised Plaintiff that such employment would violate the restrictive covenants contained in his Key Employee Agreement with Medco's predecessor.  Defendant further admits that Plaintiff executed the Key

Employee Agreement in 1998.   Defendant denies the remaining allegations contained in paragraph 1 of Plaintiff's Complaint.

## PARTIES

2.      Defendant admits the allegations contained in paragraph 2.

3.      With respect to the allegations contained in paragraph 3, Medco denies that it does business as ESI.  Defendant admits that Express Scripts, Inc. ("ESI") is a St. Louis, Missouri based health care company.  Further answering, Defendant states that on April 2, 2012, Express Scripts Holding Company completed its merger of Medco Health Solutions, Inc. Express Scripts, Inc. ("ESI"),   Medco Health Solutions, Inc., and Medco Health Services, Inc. ("Medco") are wholly owned subsidiaries of Express Scripts Holding Company. As a result of the merger, the operations of ESI and Medco have been integrated.   Defendant denies the remaining allegations contained in paragraph 3.

## JURISDICTION AND VENUE

4.      The allegations contained in paragraph 4 call for a legal conclusion to which no response is required.  Further answering, Defendant admits that Medco Health Solutions Inc.  is registered to do business in the State of Connecticut.

5.      The allegations contained in paragraph 5 call for a legal conclusion to which no response is required.   Further answering, Defendant admits that Plaintiff is a resident of this judicial district.

## FACTS

6.      With respect to the allegations contained in paragraph 6, Defendant admits that Plaintiff is 45 years old and began his employment with Medco in 1998 as a Business Analyst.

Defendant admits that Plaintiff remained employed by the Company[1] until he voluntarily resigned his employment in January 2013. Defendant is without knowledge or information sufficient to form a belief as to how many children Plaintiff has fathered, the length of his residence in Old Greenwich, and whether he performed his job duties "faithfully", and therefore, denies these allegations.

7.      With respect to the allegations contained in paragraph 7, Defendant admits that that the Company is one of the largest managers of prescription drug plans (PDPs) and it operate throughout the United States. Defendant admits that it sells PDPs to various employer sponsored health plans. Defendant denies the remaining allegations contained in paragraph 7 of the Complaint.

8.      With respect to the allegations contained in paragraph 8, Defendant admits that one of Plaintiff's job duties as Senior Director, Medicare Operations was to manage operations related to compliance with government regulations applicable to Medicare Part D. Defendant denies the remaining allegations contained in paragraph 8 of the Complaint.

9.      Defendant admits the allegations contained in Paragraph 9.

10.     With respect to the allegations contained in paragraph 10, Defendant admits that one of Plaintiff's job duties was compliance with federal regulations applicable to Medicare Part D prescription drug plans. Defendant denies the remaining allegations contained in Paragraph 10 of the Complaint.

11.     With respect to the allegations contained in paragraph 11 of the Complaint, Defendant admits that the Medicare Part D regulations are published and that entities are expected to comply with them. Defendant denies the remaining allegations contained in

---

[1] Throughout this Answer, Affirmative Defenses and Counterclaim, ESI and Medco are collectively referred to as the "Company."

Paragraph 11 of the Complaint.

12.     With respect to the allegations contained in Paragraph 12, Defendant states that it shares limited information regarding compliance with Coventry, one of its customers.   Further answering, Defendant states that its agreement with Coventry contains a Confidentiality Provision which prohibits Coventry from disclosing the Confidential Information it receives from the Company and prohibits it from using that information for any purpose not authorized by the Company except as necessary to perform its obligations under the parties' agreement. Further answering, Defendant denies that it shares confidential or proprietary information with Coventry regarding its compliance processes, policies and procedures.   Defendant denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.     With respect to the allegations contained in Paragraph 13, Defendant admits that currently the majority of the members enrolled in their Medicare Part D prescription drug plans are employee (or retiree) participants.   Defendant denies the remaining allegations contained in Paragraph 13 of the Complaint.

14.     With respect to the allegations contained in Paragraph 14, Defendant admits that following the acquisition of Medco, the size of the workforce at the New Jersey location where Plaintiff worked was reduced.   Defendant admits that Plaintiff was an at-will employee.   Further answering, Defendant states that in 2012, Plaintiff was paid a retention bonus of $122,175.00. Defendant is without knowledge or information sufficient to form a belief as to Plaintiff's concerns, his conversations, or when he began looking for a new job, and, therefore, Defendant denies these allegations.

15.     With respect to the allegations contained in paragraph 15, Defendant admits that at the inception of his employment with Medco, he signed a Key Employee Agreement, which

4

was attached to the Complaint as Exhibit A.  Further answering, Defendant states that the Key Employee Agreement speaks for itself.

16.     Defendant denies the allegations contained in Paragraph 16.

17.     Defendant admits the allegations contained in Paragraph 17.

18.     Defendant admits the allegations contained in Paragraph 18.

19.     With respect to the allegations contained in Paragraph 19, Defendant admits that Coventry employs Plaintiff as Vice President, Medicare Part D Operations and that Coventry is a customer of the Company.  Defendant denies that Coventry is not its competitor.  Defendant is without knowledge or information sufficient to form a belief as to whether Coventry's Medicare Part D business is 100% devoted to individuals and therefore denies these allegations. Defendant denies the remaining allegations contained in Paragraph 19.

20.     With respect to the allegations contained in Paragraph 20, Defendant admits the when Plaintiff advised his manager he intended to accept his position at Coventry, Plaintiff was advised that the Company believes his position violates the terms of his Key Employee Agreement and that the Company would pursue the matter.  Defendant denies the remaining allegations contained in Paragraph 20.

21.     Defendant admits that Plaintiff has commenced this lawsuit.  Defendant denies the remaining allegations contained in Paragraph 21.

## COUNT I

22.     Defendant incorporates its responses to Paragraphs 1 through 21 of Plaintiff's Complaint, as if fully set forth herein.

23.     Defendant denies the allegations contained in Paragraph 23.

24.     Defendant admits the allegations contained in Paragraph 24.

25.     Defendant denies the allegations contained in Paragraph 25.

26.     Defendant denies the allegations contained in Paragraph 26.

27.     Any allegations not expressly admitted are hereby denied.

## AFFIRMATIVE DEFENSES

28.     For further answer and affirmative defense, Defendant states that Plaintiff's Complaint fails to state a claim upon which relief can be granted

29.     For further answer and affirmative defense, Defendant states that Plaintiff's claim is barred by the doctrine of unclean hands.

30.     Defendant reserves the right to amend or modify this Answer and defenses or Affirmative Defenses based upon information that comes to light in discovery or otherwise.

WHEREFORE, having fully answered Plaintiff's Complaint, Defendant prays that this Court dismiss the Complaint, together with its costs herein expended.

## COUNTERCLAIM

Counterclaim Plaintiff/Defendant Medco Health Solutions, Inc. d/b/a Express Scripts Holding Company, as and for its Counterclaim, states as follows.

## PARTIES

1.     Express Scripts Holding Company is a Delaware corporation, with its principal place of business in St. Louis, Missouri.  It is a citizen of the states of Delaware and Missouri.

2.     Medco Health Services, Inc. is a Delaware corporation, with its principal place of business in Franklin Lakes, New Jersey.  It is a citizen of the states of New Jersey and Delaware.

3.     Medco Health Services, Inc. is a wholly owned subsidiary of Medco Health Solutions, Inc.   Medco Health Solutions, Inc. is a Delaware corporation, with its principal place

6

of business in Franklin Lakes, New Jersey.   It is a citizen of the states of New Jersey and Delaware.

4.      Medco Health Solutions, Inc. is the successor to Merck-Medco Managed Care, LLC In particular, in August 2003, Merck-Medco Managed Care, LLC was spun-off from its parent organization, Merck & Co., Inc.   Merck-Medco changed its name to Medco Health Solutions, Inc.

5.      On April 2, 2012, Express Scripts Holding Company completed its merger of Medco Health Solutions, Inc.  Express Scripts, Inc. ("ESI"), Medco Health Solutions, Inc. and Medco Health Services, Inc. ("Medco) are wholly owned subsidiaries of Express Scripts Holding Co.   See Declaration of Michael Looney ("Looney Dec."), attached hereto as Exhibit 1, at ¶4.

6.      As a result of the merger, the operations of Medco and ESI have been integrated. Throughout this Counterclaim, ESI and Medco are collectively referred to as the "Company." Looney Dec. ¶ 4.

7.      Upon information and belief, Counterclaim - Defendant Marinelli resides in, and is a citizen of, the State of Connecticut.

8.      Prior to resigning his employment, Marinelli was employed by the Company as Senior Director, Medicare Operations.   In this capacity, Marinelli was responsible for the Company's Medicare Part D Prescription Drug Plan ("PDP") Operations.  Marinelli worked out of the Company's Montvale, New Jersey location.   Looney Dec. ¶ 6.

9.      Marinelli was a key employee in the Company's Government Programs division. Looney Dec. ¶ 7.

10.      In 2012, Marinelli received compensation from the Company in excess of $450,000.00.  In particular, in 2012, he received a retention bonus of $122,175.00.  He received

7

performance bonuses totaling $75,637.67. He received $92,733.00 in income from exercising stock options. His base salary at the time of his resignation was $167,000.00 per year. Looney Dec. ¶ 8.

11.     Marinelli is employed by Coventry Health Care, Inc. ("Coventry"), a direct competitor of the Company, as Vice President, Part D Operations.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this cause of action pursuant to 28 U.S.C. §1332, because there is complete diversity of citizenship among the parties and the amount in controversy, exclusive of interests and costs, exceeds $75,000.00.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Counterclaim Defendant is a resident of this judicial district.

## FACTS COMMON TO ALL COUNTS

14.     The Company is engaged in the highly competitive business of pharmacy benefit management ("PBM"). The Company provides comprehensive, integrated PBM services, including network pharmacy claims processing, mail pharmacy services, specialty pharmacy services, specialty benefit management, benefit design consultation, drug-utilization review, formulary management, and retail pharmacy network development. The Company provides pharmacy services for private and public employers, health plans, labor unions, government agencies, and individuals served by Medicare Part D Prescription Drug Plans ("PDPs"). Looney Dec. ¶ 9.

15.     The Company's success in the highly competitive PBM industry and in the Medicare Part D space, is dependent upon a number of factors, including the confidential and proprietary information that the Company has developed or acquired over the years through the

expenditure of substantial time and resources.  Looney Dec. ¶ 10.

16.     Such confidential and proprietary information ("Confidential Information") consists of, but is not limited to: information relating to the Company's systems, processes, finances, management techniques, product and service pricing, Company-developed software, trade secrets, business strategies and marketing plans, training, customers, suppliers, actual and prospective business transactions and related matters, bidding processes, negotiation strategies and other information that is not known generally or publicly outside the Company.  Looney Dec. ¶ 11.

17.     Marinelli began his employment with the Company on June 22, 1998 as a Business Analyst. He was promoted within the organization a number of times and on August 17, 2009 became Senior Director, Medicare Operations.   Looney Dec. ¶ 12.

18.     As Senior Director, Medicare Operations, Marinelli was responsible for oversight of the Company's Medicare PDP operations including developing and maintaining the budget, directing and managing member enrollment, premium billing, CMS subsidy reconciliation, claims surveillance, coordination of benefits, and customer service oversight for both employer group waiver plans and individual members.  Looney Dec. ¶  13.  A true and accurate copy of Marinell's LinkedIn profile, accessed on January 30, 2013, in which he describes his job duties at the Company is attached hereto as Looney Dec. Exhibit A.  See Looney Dec. ¶ 15.

19.     Marinelli was responsible for an operations and outsourcing budget of tens of millions of dollars and supervised dozens of individuals.   Looney Dec. ¶ 14.

20.     Marinelli was responsible for developing, implementing and overseeing the Company's processes, procedures and methods for complying with applicable statutory and regulatory mandates and ensuring a high rating under the Centers for Medicare and Medicaid

Services (CMS)'s Five-Star Quality Rating System.  Looney Dec. ¶ 16.

21.      CMS measures how well PDPs perform on over 50 measures in areas including:
(1) member experience with the drug plan, (2) drug pricing and patient safety, (3) customer
service, and (4) member complaints, problems getting services, and choosing to leave the plan.
CMS then assigns an overall quality rating, between one and five stars, to each contract.
Consumers see the star rating during the open enrollment process.  In addition, plan receiving
rates of 4 or more stars receive bonus payments.   Finally, CMS can sanction plans that receive
low star ratings.   Looney Dec. ¶ 17.

22.      In addition, CMS can sanction plans that do not comply with CMS's enrollment
requirements.  For example, on or around January 15, 2013, CMS imposed sanctions on a CVS
Medicare Part D plan for having "widespread data system failures that have directly led to
extensive violations of the Part D program's requirement regarding enrollment processing, call
center operation, and claims processing."  A true and accurate copy of CMS's sanction letter to
CVS is attached hereto as Looney Dec. Exhibit B.  As a sanction, CMS suspended the plans'
ability to enroll Medicare beneficiaries and to engage in marketing activities to Medicare
beneficiaries. Looney Dec. ¶ 18.

23.      Some of the Company's processes, procedures and methods for complying with
applicable statutory and regulatory mandates and ensuring a high star rating are confidential.
Looney Dec. ¶ 19.

24.      Marinelli was responsible for the Company's Medicare PDP Operations across
the United States.  Looney Dec. ¶ 20.

25.      In his position, Marinelli was on the Company's PDP Leadership team.  Looney
Dec. ¶ 21.

26.     During his employment with the Company, Marinelli gained access to the Company's Confidential Information. As a result of the training, education and experience provided by the Company, Marinelli became intimately familiar with and helped develop the Company's confidential processes, procedures and methods for complying with applicable statutory and regulatory mandates and ensuring a high rating under CMS's Five-Star Quality Rating System.  Looney Dec. ¶ 22.

27.     As part of the Leadership team, Marinelli participated in weekly conference calls during which the Company's three year strategy for growing the PDP business and capturing market share was discussed.  The Company's three year strategy is kept strictly confidential. Looney Dec. ¶ 23.

28.     In addition, Marinelli gained access to confidential information concerning the Company's largest PDP clients, employer sponsored Medicare Part D plans.  This confidential information includes enrollment and eligibility challenges with the clients and renewal issues. Looney Dec. ¶ 24.

29.     The Company expends substantial time and resources in acquiring, developing and safeguarding its Confidential Information, which has significant economic value to both the Company and its competitors, and is not generally known outside the Company.  The Company has spent millions of dollars developing and implementing its confidential processes, procedures and methods.   The Company has spent a significant amount of money developing its three year business strategy for growing the PDP business and capturing market share.  Looney Dec. ¶ 25.

30.     Because of its value, the Company carefully safeguards its Confidential Information by, among other things, implementing and maintaining various computer security protocols and requiring employees with access to Confidential Information to sign

11

confidentiality and nondisclosure agreements.  Looney Dec. ¶ 26.

31.     The Company has a legitimate business interest in keeping its Confidential Information confidential.

32.     At the inception of his employment and in consideration for his employment, on June 22, 1998, Marinelli executed a "Key Employee Agreement."  A true and accurate copy of the Key Employee Agreement is attached hereto as Looney Dec. Exhibit C.  The Key Employee Agreement is incorporated herein by reference.  In the Key Employee Agreement, Marinelli agreed to abide by certain nondisclosure, noncompetition and nonsolicitation restrictions. Looney Dec. ¶ 27.  Further, the Agreement provides it with be governed by New Jersey law.

33.     In the Key Employment Agreement, Marinelli expressly agreed to the following restrictions, in relevant part:

> 2.  <u>Covenant Against Use and Disclosure.</u>  I recognize that in connection with my employment, I may learn of, and/or it may be desirable or necessary for the Employer to disclose to me confidential information ("Confidential Information"). I understand that Confidential Information is valuable and proprietary to the Employer (or to third parties that have entrusted the Confidential Information to the Employer). I agree that, except as required by my employment with the Employer, I will not at any time, directly or indirectly, use, publish, communicate, describe, disseminate, or otherwise disclose Confidential Information to any person or entity without the express prior written consent of the Employer. The term Confidential Information shall include, but shall not be limited to: (a) customer lists, lists of potential  customers and details  of agreements with customers; (b) acquisition, expansion, marketing, financial and other business information and plans of the Employer; (c) research and development: (d) data concerning usage of prescription drugs and any other data compiled by the Employer; (c) computer programs; (f) sources of supply; (g) identity of specialized consultants and contractors and Confidential Information developed by them for the Employer; (h) purchasing, operating and other cost data; (i) special customer needs, cost and pricing data; (j) employee information (including, but not limited to, personnel, payroll, compensation and benefit data and plans); and (k) patient records and data, including all such information recorded in manuals, memoranda, projections, minutes, plans, drawings, designs, formula books, specifications, computer programs and records, whether or not legended or otherwise identified by the Employer as Confidential Information, as

well as such information that is the subject of meetings and discussions and not recorded. Confidential Information shall not include such information that is generally available to the public (other than as a result of a disclosure by me or others in violation of law or agreement) or that is disclosed to me by a third party under no obligation to keep such information confidential.

3. <u>Return of Documents.</u>   Upon the termination of my employment with the Employer or upon the Employer's request, whichever is sooner, I shall immediately deliver to the Employer all plans, designs, drawings, specifications, listings, manuals, records, notebooks, computer memory, disks or programs, and similar repositories of or containing Confidential Information or other data relating to the Employer's products, services, or business then in my possession or control or available from other persons receiving such documents from me, whether prepared by me or others. I shall not retain any copies or abstracts of any such documents.

4. <u>Restrictions on Competitive Employment.</u>   During my employment, and for a period of twelve (12) months following the termination of my employment, I will not (as an individual, principal, agent, employee, consultant, or otherwise), directly or indirectly in any territory in which the Employer and/or any of its affiliates does business and/or markets its products and services, engage in activities competitive with, nor render services to any firm or business engaged or about to become engaged in the Business of the Employer. The Business of the Employer includes, but is not limited to, the following businesses: (i) the third party prescription drug claims processing business; (ii) the design, development or marketing of or consulting as to, prescription drug benefit plans; (iii) the provision of mail service pharmacy (including all those products and services that are presently or hereafter marketed by the Employer, or that are in the development stage at the time of termination of my employment and are actually marketed by the Employer and/or its affiliates thereafter; (iv) the collection, analysis and/or sale of data relating to prescription drug utilization; (v) the pharmacy benefit management and disease management businesses; (vi) the organization and administration of retail pharmacy networks; and (vii) any other business in which the Employer and/or any of its affiliates is then engaged as to which I have involvement in the course of my employment hereunder and/or acquired or received Confidential Information (hereinafter collectively, the "Business of the Employer"). In addition, I will not have an equity interest in any such firm or business other than as a 1% or less shareholder of a public corporation. The restrictions contained in this paragraph 4 shall not extend to pharmaceutical manufacturers, other than those entities which include businesses competing with Merck-Medco Managed Care, L.L.C. or its subsidiaries.

5. <u>Restriction Against Solicitation and Inducement.</u>   During my employment and for a period of twelve ( 12) months following the termination of my employment, I will not, directly or indirectly: (i) solicit or contact any customer or targeted potential customer of the Employer and/or its affiliates upon whom I called or

whom I solicited or with whom I became acquainted after commencement of my employment; (ii) induce or attempt to induce, any employees, agents or other consultants of the Employer and/or its affiliates to do anything from which I am restricted by reason of this Agreement; (iii) offer or aid others to offer employment to any employees, agents, or consultants of the Employer and/or its affiliates; or (iv) provide services to any customer or otherwise interfere with or disrupt any contractual or potential contractual relationship between any customer and the Employer and/or its affiliates.

34.     Furthermore, in the Key Employee Agreement, Marinelli expressly acknowledged the terms of the Agreement were fair and reasonable.  In particular, Marinelli agreed as follows:

8.  <u>Severability.</u>  I acknowledge that the terms of this Agreement are fair and reasonable at the date signed by me. However, in light of the possibility of a change of conditions or differing interpretations by a court of what is fair and reasonable, I agree that if any one or more of the terms, provisions, covenants, or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the terms, provisions, covenants, and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated. Further, if any one or more of the terms, provisions, covenants or restrictions contained in this Agreement shall for any reason be determined by a court of competent jurisdiction to be excessively broad as to duration, geographical scope, activity, or subject, it shall be construed, by limiting or reducing it, so as to be enforceable to the maximum extent compatible with then applicable law.

35.     Marinelli also agreed that the Company was entitled to injunctive and other relief in the event that he violated any of the restrictive covenants:

10. <u>Non-Waiver/Remedies.</u>   Any waiver by the Employer of a breach of any provision or covenant in this Agreement shall not operate or be construed as a waiver of any subsequent breach or of any rights which the Employer may otherwise have. I acknowledge that breach of this Agreement would cause grave and irreparable injury to the Employer that would not be compensable in money damages, and therefore, in addition to the Company's other express or implied remedies, the Company shall be entitled to injunctive and other equitable relief to prevent any actual intended or likely injuries that may result from such breach. However, nothing in this Agreement shall limit any other right or remedy to which the Employer may be entitled.

36.     Finally, Marinelli agreed that the Key Employee Agreement would "inure to the benefit of and be binding upon the successor and assigns of the Employer."

14

37.     The nondisclosure, noncompetition and nonsolicitation restrictions in Marinelli's Key Employee Agreement with the Company will be collectively referred to as the "Restrictive Covenants."

38.     On or around December 28, 2012, Marinelli communicated to the Company that he was resigning his employment with the Company in order to accept employment at Coventry as Vice President, Part D Operations.  A true and accurate copy of the job description Marinelli provided to the Company for the position he accepted with Coventry is attached hereto as Looney Dec. Exhibit D.  Looney Dec. ¶ 28.

39.     Coventry is a national managed healthcare company based in Bethesda, Maryland.  Coventry is a direct competitor of the Company in the area of providing Medicare Part D PDPs.  Looney Dec. ¶ 29.

40.     On August 20, 2012, Aetna announced it had entered into an agreement to acquire Coventry.  Aetna is a direct competitor of the Company in the area of providing Medicare Part D PDPs.  Looney Dec. ¶ 30.

41.     Marinelli's Key Employment Agreement expressly prohibits him, for a period of one (1) year following the termination of his employment with the Company, from working for any firm or business that is engaged in the same businesses as the Company.  *See* Looney Dec. Exhibit C at ¶ 4.

42.     Accordingly, employment with Coventry violates Paragraph 4 of Marinelli's Key Employee Agreement because both Coventry and the Company are in the business of providing Medicare Part D PDPs.

43.     Because of Marinelli's access to and his intimate knowledge of the Company's Confidential Information, Marinelli is in a position wherein Coventry can obtain an unfair

competitive advantage by learning of and implementing the Company's business strategy and its confidential processes, procedures and methods, which the Company spent millions of dollars developing. Looney Dec. ¶ 31.

44.     The Company expressly reminded Marinelli of his Restrictive Covenants with the Company. In addition, the Company asked Marinelli to reconsider his decision. Looney Dec. ¶ 32.

45.     Marinelli's last day of employment with the Company was on January 18, 2013. Looney Dec. ¶ 33.

46.     Upon information and belief, Marinelli commenced his employment with Coventry on January 28, 2013. Looney Dec. ¶ 34.

47.     The Company communicated with Coventry and Marinelli's attorney regarding Marinelli's contractual obligations to the Company. The Company indicated that it would not object to Marinelli working for Coventry in a role outside of Coventry's Medicare Part D Operations provided Marnelli did not disclose the Company's Confidential Information. Coventry and Marinelli refused to agree to this limitation.

48.     Upon information and belief, in connection with his work for Coventry, Marinelli threatens to use and/or disclose sensitive, confidential and proprietary information about information relating to the Company's business strategy, its customers, and its processes, procedures and methods for complying with applicable statutory and regulatory mandates and ensuring a high rating under the CMS's Five-Star Quality Rating System.

## <u>COUNT I – BREACH OF CONTRACT</u>

49.     The Company incorporates the foregoing allegations as if fully set forth herein.

50.     The Key Employee Agreement constitutes a valid and binding contract between

the Company and Marinelli, entered into by parties with capacity to contract.

51.     In consideration of the Restrictive Covenants in the Key Employee Agreement, the Company provided employment to Marinelli.

52.     The Restrictive Covenants described in the Key Employee Agreement are reasonable, no greater than fairly required for the protection of the Company, and preserve legitimate protectable interests of the Company, including protection of its Confidential Information and trade secrets.

53.     The Restrictive Covenants described in the Key Employee Agreement cause no undue hardship to Marinelli.

54.     The Restrictive Covenants described in the Key Employee Agreement do not injure the public interest.

55.     The Company has performed all necessary obligations and/or conditions precedent under the Key Employee Agreement.

56.     Marinelli has breached the Restrictive Covenants in the Key Employee Agreement.

57.     As part of the Key Employee Agreement, Marinelli acknowledged that his breach of the Key Employee Agreement would cause the Company irreparable harm and that the Company was entitled to injunctive relief.  Marinelli's conduct as alleged herein has caused and will continue to cause irreparable injury to the Company and entitles it to temporary, preliminary and permanent injunctive relief and the entry of judgment against Marinelli for monetary damages, including all actual, consequential, and incidental damages, and for prejudgment interest and other costs.

58.     No legal remedy can adequately protect the Company from Marinelli's continuing

acts of violating the Key Employee Agreement in that strict monetary damages to the Company are unascertainable. If Marinelli is permitted to continue to violate the Key Employee Agreement, the Company's competitive stature and profitability will be irreparably and irrevocably injured.

59.    The Company faces immediate, irreparable and irrevocable harm as a result of the conduct described above. Injunctive relief is necessary to afford the Company adequate relief.

60.    The Company has a substantial likelihood of success on the merits of its claims against Marinelli.

61.    Granting the Company injunctive relief is not adverse to the public interest. In fact, an injunction against Marinelli's wrongful conduct will serve the public interest by enforcing valid contracts, protecting valuable trade secrets, and preventing unfair competition.

62.    The harm faced by the Company outweighs any harm that Marinelli may suffer from an order granting the Company injunctive relief. Granting injunctive relief will not cause Marinelli undue hardship.

63.    The Company has a protectable interest in protecting its trade secrets and confidential information to which Marinelli had access during his employment with the Company.

WHEREFORE, the Company respectfully requests judgment against Counterclaim-Defendant Marinelli as follows:

I.        enter a temporary restraining order, preliminary injunction and/or a permanent injunction:

a.    restraining and enjoining Marinelli, and any person or entity in active concert or participation with him, from directly or indirectly using or disclosing to any person or entity any confidential or proprietary information of any kind,

18

nature or description concerning any matters affecting or relating to the business of the Company;

b. restraining and enjoining Marinelli, and any person or entity in active concert or participation with him, for a period of up to and including January 18, 2014, from directly or indirectly anywhere in the United States, engaging in activities competitive with, or rendering services to any firm or business engaged or about to become engaged in business of providing or servicing Medicare Part D prescription drug plans;

c. ordering Marinelli to return all originals and copies of documents, memoranda, notes, records, data, computer programs, disks, data contained on hard drives or other computer medium, or reports made or compiled by, delivered to, or otherwise acquired by Marinelli concerning, containing or embodying any confidential or proprietary information about the Company; and

d. restraining and enjoining Marinelli, and any person or entity in active concert or participation with him from otherwise violating Marinelli's Key Employee Agreement with the Company.

II.     award the Company compensatory damages;

III.    award the Company its costs and expenses incurred in connection with this action;

        and

IV.     grant the Company such further relief as the Court deems just and proper.


DEFENDANT MEDCO HEALTH
SOLUCTIONS, INC. (d/b/a EXPRESS
SCRIPTS HOLDING COMPANY)


/s/ Stephen P. Rosenberg
Stephen P. Rosenberg (Bar No. CT26601)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
Email: sprosenberg@littler.com


19

Harry W. Wellford, Jr. #32305 MO, pro hac
vice application to be filed
Patricia J. Martin #57420 MO, pro hac vice
application to be filed
LITTLER MENDELSON, P.C.
One Metropolitan Square
211 North Broadway
Suite 1500
St. Louis, MO  63102
Telephone: 314.659.2011
Facsimile: 314.659.2099
Email: hwellford@littler.com
Email: pmartin@littler.com

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JOSEPH MARINELLI., | Civil Action No. |
| Plaintiff, | |
| v. | |
| MEDCO HEALTH SOLUTIONS, INC, d/b/a EXPRESS SCRIPTS, INC., | |
| Defendant. | |

## DECLARATION OF MICHAEL LOONEY

COMES NOW, Michael Looney, and pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am a citizen of the United States, over 18 years of age, and competent to testify as a witness at trial in this case.

2.     The information set out below is based on my personal knowledge.

3.     I am the Vice President, Prescription Drug Plans and Retiree Solutions at Express Scripts, Inc.  I have been employed by ESI since August 2009.

4.     On April 2, 2012, Express Scripts Holding Company completed its merger of Medco Health Solutions, Inc.  Medco Health Services, Inc. is a wholly owned subsidiary of Medco Health Solutions, Inc.  Express Scripts, Inc. ("ESI"), Medco Health Solutions, Inc. and Medco Health Services, Inc. ("Medco") are wholly owned subsidiaries of Express Scripts Holding Company.  As a result of the merger, the operations of Medco and ESI have been integrated.  Throughout this declaration, ESI and Medco are collectively referred to as the "Company."  In my capacity as Vice President, Prescription Drug Plans and Retiree Health Solutions, I oversee the Company's Medicare Part D Prescription Drug Plans.

5.      As Vice President, Prescription Drug Plans and Retiree Health Solutions, Joseph Marinelli reported directly to me.

6.      Mr. Marinelli was employed by the Company as Senior Director, Medicare Operations.  In this capacity, Marinelli was responsible for the Company's Medicare Part D Prescription Drug Plan ("PDP") Operations.  Marinelli worked out of the Company's Montvale, New Jersey location.

7.      Marinelli was a key employee in the Company's Government Programs division.

8.      Marinelli's compensation records, kept in the ordinary course of the Company's business, reflect that in 2012, Marinelli received compensation from the Company in excess of $450,000.00.  In particular, in 2012, he received a retention bonus of $122,175.00.  He received performance bonuses totaling $75,637.67.  He received $92,733.00 in income from exercising stock options.  His base salary at the time of his resignation was $167,000.00 per year.

9.      The Company is engaged in the highly competitive business of pharmacy benefit management ("PBM").   The Company provides comprehensive, integrated PBM services, including network pharmacy claims processing, mail pharmacy services, specialty pharmacy services, specialty benefit management, benefit design consultation, drug-utilization review, formulary management, and retail pharmacy network development.  The Company provides pharmacy services for private and public employers, health plans, labor unions, government agencies, and individuals served by Medicare Part D Prescription Drug Plans.

10.     The Company's success in the highly competitive PBM industry, including in the Medicare Part D space, is dependent upon a number of factors, including the confidential and proprietary information that the Company has developed or acquired over the years through the expenditure of substantial time and resources.

11.     Such confidential and proprietary information ("Confidential Information") consists of, but is not limited to: information relating to the Company's systems, processes, finances, management techniques, product and service pricing, Company-developed software, trade secrets, business strategies and marketing plans, training, customers, suppliers, actual and prospective business transactions and related matters, bidding processes, negotiation strategies and other information that is not known generally or publicly outside the Company.

12.     Marinelli's personnel records, kept in the ordinary course of the Company's business, reflect that Marinelli began his employment with the Company on June 22, 1998 as a Business Analyst. He was promoted within the organization a number of times and on August 17, 2009 became Senior Director, Medicare Operations.

13.     As Senior Director, Medicare Operations, Marinelli was responsible for oversight of the Company's Medicare PDP operations including developing and maintaining the budget, directing and managing member enrollment, premium billing, CMS subsidy reconciliation, claims surveillance, coordination of benefits, and customer service oversight for both employer group waiver plans and individual members.

14.     Marinelli was responsible for an operations and outsourcing budget of tens of millions of dollars and supervised dozens of individuals.

15.     Attached hereto as Exhibit A is a true and accurate copy of Mr. Marinelli's LinkedIn profile, which was accessed on January 30, 2013, in which he describes his duties during his employment with the Company.

16.     Marinelli was responsible for developing, implementing and overseeing the Company's processes, procedures and methods for complying with applicable statutory and

regulatory mandates and ensuring a high rating under the Centers for Medicare and Medicaid Services (CMS)'s Five-Star Quality Rating System.

17.     CMS measures how well prescription drug plans (PDPs) perform on over 50 measures in areas including: (1) member experience with the drug plan, (2) drug pricing and patient safety, (3) customer service, and (4) member complaints, problems getting services, and choosing to leave the plan  CMS then assigns an overall quality rating, between one and five stars, to each contract.  Consumers see the star rating during the open enrollment process.  In addition, plans receiving rates of 4 or more stars receive bonus payments.   Finally, CMS can sanction plans that receive low star ratings.

18.     In addition, CMS can sanction plans that do not comply with CMS's enrollment requirements.  For example, on or around January 15, 2013, CMS imposed sanctions on a CVS Medicare Part D plan for having "widespread data system failures that have directly led to extensive violations of the Part D program's requirement regarding enrollment processing, call center operation, and claims processing."  A true and accurate copy of CMS's sanction letter to CVS is attached hereto as Exhibit B.  As a sanction, CMS suspended the plans' ability to enroll Medicare beneficiaries and to engage in marketing activities to Medicare beneficiaries. *Id.*

19.     Some of the Company's processes, procedures and methods for complying with applicable statutory and regulatory mandates and ensuring a high star rating are confidential.

20.     Marinelli was responsible for the Company's Medicare PDP Operations across the United States.

21.     In his position, Marinelli was on the Company's PDP Leadership team.

22.     During his employment with the Company, Marinelli gained access to the Company's Confidential Information.  As a result of the training, education and experience

provided by the Company, Marinelli became intimately familiar with and helped develop the Company's confidential processes, procedures and methods for complying with applicable statutory and regulatory mandates and ensuring a high rating under CMS's Five-Star Quality Rating System.

23.    As part of the Leadership team, Marinelli participated in weekly conference calls during which the Company's three year strategy for growing the PDP business and capturing market share was discussed. The Company's three year strategy is kept strictly confidential.

24.    In addition, Marinelli gained access to confidential information concerning the Company's largest PDP clients, employer sponsored Medicare Part D plans. This confidential information includes enrollment and eligibility challenges with the clients and renewal issues.

25.    The Company expends substantial time and resources in acquiring, developing and safeguarding its Confidential Information, which has significant economic value to both the Company and its competitors, and is not generally known outside the Company. The Company has spent millions of dollars developing and implementing its confidential processes, procedures and methods. The Company has spent a significant amount of money developing its three year business strategy for growing the PDP business and capturing market share.

26.    Because of its value, the Company carefully safeguards its Confidential Information by, among other things, implementing and maintaining various computer security protocols and requiring employees with access to Confidential Information to sign confidentiality and nondisclosure agreements.

27.    The Company's records reflect that at the inception of his employment and in consideration for his employment, on June 22, 1998, Marinelli executed a "Key Employee

Agreement." A true and accurate copy of the Key Employee Agreement, kept in the ordinary course of the Company's business, is attached as Exhibit C.

28.     On or around December 28, 2012, Marinelli communicated to the Company that he was resigning his employment with the Company in order to accept employment at Coventry as Vice President, Part D Operations. A true and accurate copy of the job description Marinelli provided to the Company for the position he accepted with Coventry is attached hereto as Exhibit D.

29.     Coventry Health Care, Inc. is a national managed healthcare company based in Bethesda, Maryland. It is a direct competitor of the Company in the area of providing Medicare Part D Prescription Drug Plans.

30.     On August 20, 2012, Aetna announced it had entered into an agreement to acquire Coventry. Aetna is a direct competitor of the Company in the area of providing Medicare Part D Prescription Drug Plans.

31.     Because of Marinelli's access to and his intimate knowledge of the Company's Confidential Information, Marinelli is in a position wherein Coventry can obtain an unfair competitive advantage by learning of and implementing the Company's business strategy and its confidential processes, procedures and methods, which the Company spent millions of dollars developing.

32.     The Company expressly reminded Marinelli of his Restrictive Covenants with the Company. In addition, the Company asked Marinelli to reconsider his decision.

33.     Marinelli's last day of employment with the Company was on January 18, 2013.

34.     Upon information and belief, Marinelli commenced his employment with Coventry on January 28, 2013.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

_____*11*_____ day of February, 2013.

Michael Looney

Firmwide:118219884.1 047132.1017

# LOONEY DECLARATION

# EXHIBIT A

Advertising On Google - Show up when your customers search. See if AdWords is right for you.   From: Google



# Joseph Marinelli

at Express Scripts (formerly Medco)

Greater New York City Area | Hospital & Health Care

| | |
|---|---|
| Current | Express Scripts (formerly Medco) |
| Previous | Medco, AIG, Health Management Systems |
| Education | Fordham Graduate School of Business |

 

414 connections

www.linkedin.com/pub/joseph-marinelli/0/912/273



Picture Yourself at Express Scripts

**Michelle Y.**
Legal at Express Scripts

Follow Company

---

BACKGROUND

### SUMMARY

Information Technology professional with 20 years experience in healthcare systems and operations management. Well rounded business manager with experience in project management, product ownership, database reconciliation, systems development, and technical leadership. Expert Medicare Part D knowledge and operations experience.

Specialties: PBM system processing
Medicare
Medicaid

### EXPERIENCE

**Senior Director, Medicare Enrollment, Billing, Reconciliation and Vendor Services** 

Express Scripts (formerly Medco)

2009 – Present (4 years) | Greater New York City Area

Manage Operations for the Administrative Services of the Express Scripts Medicare Prescription Drug Plan (PDP), the 4th largest Medicare PDP.
• Oversee day-to-day operations for Medicare member enrollment, premium billing, CMS subsidy, reconciliation, customer service, complaints and quality, inclusive of both Employer group (EGWP) plan and individual member enrollment.
• Direct BPO services of the Enrollment function to an external supplier. Manage all Supplier requirements, including performance management, procurement and compliance and oversight programs
• Manage regulatory affairs, including interpretation of CMS directives, creation of business requirements, maintenance of plan policies and use cases. Oversee end-to-end lifecycle of systems development.
• Manage internal staff of 50 and outsourced operations of approximately 150 employees. Manage $50MM Annual operations and outsourcing budget.
• Interact with CMS Regional Office for week-to-week operations status
• Integrate the operations staff with customer service
• Effectively "scaled up" for growth of membership. Drove operations and systems enhancements to effectively handle the growth of business from 10th to 4th largest PDP. On boarded 475,000 new members for 2012 and more than doubling that figure for 2013.
• Executed the procurement process for BPO services, including RFP, supplier assessment, best and final, SLA requirements, and contract finalization. Negotiated $55MM in savings on a 5-year BPO deal.
• Achieved successful audit results from internal and CMS audits, including both program and financial CMS audits.
• Achieved top quality rating from the Government regulatory agency (CMS). CMS designated Medco as the top-rated Medicare prescription plan using CMS's "5 star" ratings program. Medco was the only 5-star national plan for 2011 and is the only 4-star national plan for 2012 and 2013.
• Drove PDE rejects of less than 0.07% for plan years 2011.

PEOPLE ALSO VIEWED


**Tom Reinckens**
VP Medicare & Medicaid Solutions


**Laura Leech**
Director Medicare Part D Operations


**Maureen Dempsey**
Director, Medicare Compliance at Coventry Health Care


**Scott Helmus**
Experienced Medicare Product Executive & Consultant


**Caryn Schuisinger**
Compliance Officer at Access Medicare NY


**Joanne Cavallo**
Director: Medicare D Operations at Medco


**Michele Paige**
Product Marketing Executive and General Manager (formerly at Express Scripts (Medco Health Solutions)


**Joseph J. Marinelli, RPh, MBA**
HealthCare Operations Executive


**Drew Thrasen**
Director, Eligibility Requirements, Triage, and Medicare Part D Operations at Express Scripts


**Tracy Grunsfeld**
Vice President, Healthcare Product Development and Operations (formerly at Express-Scripts)

*medco·*

- Manage the Vendor that executes Enrollment Operations, Customer Service and Premium Billing for the PDP

**Director / Technical Lead / Project Manager**
Medco 
1998 – 2006 (8 years)

Oversee the implementation of large sized ($5 to $15 Million) Information Technology projects. Presently working as technical lead for implementation of new Medicare Part D capabilities. Reporting to technology VP, coordinate and oversee 7 technology subteams comprising approximatley 150 onshore and offshore developers and QA testers, building all facets of the Medicare D IT capabilities, including eligibility, claims processing, pharmacy, insurance, eCommerce, customer service, finance and others. Manage the project plan and budget, coordinate issues/risks and develop/deliver senior management status reporting.

Previous projects include project management of Medicare Discount Card implementation($5 Million), SSN to Non-SSN member number conversion($5 Million), and design and project management for Commercial and Government Coordination of Benefits ($1.5 Million).

**Business Analyst**
AIG                                                    AIG
1997 – 1998 (1 year)

Business Analyst and QA tester for Professional Liability Claims Management Application

**Project Manager/Business Analyst**
Health Management Systems                          hms
1992 – 1997 (5 years)

Project Manager, Business Analyst, Developer, Account Support for Medicaid Third Party Liability product line. Write specs, develop code, run jobs, deliver reporting, manage P&L for 5 Medicaid TPL clients.

COURSES

**Independent Coursework**

• Six Sigma Greenbelt

SKILLS & EXPERTISE



| 18 | Medicare |
| 13 | Medicare Part D |
| 7 | Managed Care |
| 6 | SDLC |
| | PBM |
| | Healthcare IT |

EDUCATION

**Fordham Graduate School of Business**
MBA, Finance, Information Systems
1996 – 2000

Help Center   About   Press   Blog   Careers   Advertising : Talent Solutions :  Tools ,  Mobile :  Developers :  Publishers ,  Language :  Upgrade Your Account

LinkedIn Corporation © 2013     User Agreement   Privacy Policy  : Community Guidelines    Cookie Policy  :  Copyright Policy  ,  Send Feedback

# LOONEY DECLARATION

# EXHIBIT B

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



**PROGRAM COMPLIANCE AND OVERSIGHT GROUP**

January 15, 2013

**VIA:**
**EMAIL (Lloyd.Mcdonald@CVSCaremark.com)**
**AND FACSIMILE: (480) 314-6480**

Mr. Lloyd D. McDonald
Chief Executive Officer
Silverscript Insurance Company
9501 E. Shea Boulevard, MC125
Scottsdale, AZ 85260
Phone: 480-661-2395

Re:     Notice of Imposition of Immediate Intermediate Sanctions (Suspension of Enrollment
        and Marketing) for Medicare Prescription Drug Plan Sponsor Contract S5601

Dear Mr. McDonald:

Pursuant to 42 C.F.R. § 423.756, the Centers for Medicare & Medicaid Services (CMS) hereby
informs Silverscript Insurance Company (SSIC) of its determination to immediately impose
intermediate sanctions on the following Medicare Prescription Drug Plan (PDP) Sponsor
Contract:  S5601.

These intermediate sanctions will consist of the suspension of the enrollment of Medicare
beneficiaries (42 C.F.R. § 423.750(a)(1)) and the suspension of all marketing activities to
Medicare beneficiaries (42 C.F.R. § 423.750(a)(3)).  CMS is imposing these intermediate
sanctions immediately, effective January 15, 2013 at 11:59 p.m. EST, pursuant to 42 C.F.R.
§ 423.756(c)(2), because it has determined that SSIC's conduct poses a serious threat to the
health and safety of Medicare beneficiaries.  Pursuant to 42 C.F.R. § 423.756(c)(3), the
intermediate marketing and enrollment sanctions will remain in effect until CMS is satisfied that
the deficiencies upon which the determination was based have been corrected and are not likely
to recur.  CMS will provide SSIC with detailed instructions regarding the marketing and
enrollment suspension in a separate communication.

Mr. Lloyd McDonald
January 15, 2013
Page 2 of 12

## Summary of SSIC's Non-Compliance

SSIC currently holds a contract with CMS to administer stand-alone outpatient prescription drug benefits (i.e., Medicare Part D) to Medicare beneficiaries throughout the United States. As of January 1, 2013, SSIC is responsible for the delivery of Part D benefits to approximately four million beneficiaries. Since January 1, 2013, SSIC has experienced widespread data system failures that have directly led to extensive violations of the Part D program's requirements regarding enrollment processing, call center operation, and claims processing. These failures have created disruptions in tens of thousands of Medicare beneficiaries' access to prescription medications. CMS has determined that SSIC's operational deficiencies have resulted in the substantial failure to comply with SSIC's PDP contract and warrant the imposition of an intermediate sanction in the form of the suspension of its marketing and enrollment activities. CMS has further determined that SSIC's failures pose a serious risk to its current and prospective members' health and safety and therefore is making the sanction effective immediately.

## Relevant Part D Benefit Requirements

To receive Part D benefits, Medicare beneficiaries must elect to enroll in a prescription drug benefit plan offered by an organization that contracts with CMS to operate as a Part D sponsor (sponsor). Sponsors are required to operate systems that adjudicate claims in real time at the point of sale (i.e., at a pharmacy). 42 C.F.R. § 423.505(b)(17). To operate such a system, sponsors must accurately process enrollment transactions. 42 C.F.R. Part 423, Subpart B. This includes assigning individuals to their elected plans, transmitting enrollment data to CMS and maintaining accurate information on beneficiaries' eligibility for a low-income subsidy (LIS) that would exempt them from liability for premiums and deductibles and afford them access to special low co-payment amounts. 42 C.F.R. Part 423, Subpart B and § 423.800.

Unlike health benefits offered under the Part C or Original Medicare programs, where beneficiary payments and claims are normally processed after the delivery of covered services, outpatient prescription drug claims must be adjudicated in light of the structure (e.g., deductibles and cost sharing amounts) of the beneficiary's plan benefit package in real time at the point of sale and result in an adjudicated paid response before a pharmacy will fill a beneficiary's prescription. 42 C.F.R. §§ 423.104(a) and 423.505(b)(17). Any failure of a sponsor's data systems can immediately cause interruptions in claims processing for its enrollees at pharmacies. In those instances, the beneficiary will have to leave the pharmacy without the drug unless he or she can pay the entire cost of the drug out of his or her own pocket.

Sponsors must pay particular attention to their enrollment operations each December in preparation for the start of a new plan benefit year the following January. They must make certain that prior to January 1, their enrollment records (upon which the operation of their claims adjudication system will depend) show that the sponsor's continuing enrollees are assigned to the correct benefit plan package for the upcoming year, that new enrollees who elected the sponsor's plan during the annual election period are assigned to the plan they chose, and that the correct LIS status is recorded for each beneficiaries. 42 C.F.R. Part 423, Subparts B and § 423.800.

Mr. Lloyd McDonald
January 15, 2013
Page 3 of 12

**Deficiencies Related to the Part D Benefit**

On January 2, 2013, the 1-800-MEDICARE phone line began receiving numerous beneficiary complaints about SSIC's Part D operations.  These complaints are recorded in CMS' complaints tracking module (CTM) which plan sponsors have access to and must review.  At the same time, CMS received reports from at least 5 state health insurance program (SHIP) counseling organizations (state-operated programs that provide information and counseling to residents concerning their health insurance options) that SSIC enrollees in their states were experiencing customer service and claims processing problems.

CMS immediately contacted SSIC for more information.  On January 3, 2013, SSIC told CMS that, among other problems, it had failed to load thousands of new enrollees into its claims adjudication system.  SSIC management explained that an update of SSIC's Part D data systems performed during late 2012 had led to significant disruptions in its enrollment, LIS tracking, and claims processing operations.  SSIC has confirmed that tens of thousands of SSIC enrollees were affected by these system errors.

From January 1 through January 14, 2013, CMS received 2,340 complaints about SSIC's Part D operations.  CMS has received complaints about SSIC at a rate four times greater than the rate of complaints received about all other Part D sponsors combined during the same period. CMS' analysis of the complaints indicates failures fall into three broad categories: (1) beneficiaries not enrolled in an SSIC plan; (2) beneficiaries are enrolled in the wrong SSIC plan; and (3) incorrect LIS status for the beneficiaries.   In addition, the SSIC customer service call center experienced a dramatic increase in call volume as its members sought resolution to claims issues they were experiencing at the pharmacy as a result of SSIC system errors.

A significant number of the SSIC enrollee complaints describe instances where the member had to pay more out of pocket than was required under the terms of the benefit plan because SSIC systems could not correctly adjudicate the member's claims in real time.  For some beneficiaries, this meant paying a higher copay amount while others were charged the full cost of the drug.  In many instances, beneficiaries could not afford the higher charge and left the pharmacy without their medication.  SSIC has acknowledged to CMS that many of its enrollees have had difficulty obtaining their medications or are being charged incorrect co-pay or cost-sharing amounts. While SSIC tried to mitigate the impact of its systems failures by authorizing pharmacies to use a universal claim form for any customer claiming to be an SSIC member (which would allow the pharmacist to dispense the drug without any cost sharing and without adjudication by the sponsor), the complaints received via 1-800-MEDICARE indicate that in many instances, SSIC enrollees are continuing to leave the pharmacy counter without their prescription medications.

Therefore, CMS analysis of disclosures made by SSIC as well as complaints received by CMS demonstrate that SSIC is substantially out of compliance with 42 C.F.R. § 423.505(b)(17), which obligates Part D sponsors to use point of service systems to adjudicate claims in a timely and efficient manner.  This was a result of SSIC's substantial failure to meet its obligation, stated at 42 C.F.R. § 423.505(b)(2), to process enrollments in a manner consistent with the requirements stated at 42 C.F.R. Part 423, Subpart B.  In addition, SSIC is substantially out of compliance

Mr. Lloyd McDonald
January 15, 2013
Page 4 of 12

with the requirement, stated at 42 C.F.R. § 423.800(b), that it charge its LIS-qualified enrollees the reduced cost sharing amounts to which they are entitled.

Since January 4, 2013, CMS has held daily conference calls with SSIC management to discuss SSIC's efforts to resolve its data systems issues. At each of these meetings, SSIC management has reported that they continue to design and implement updates to their data systems to improve the accuracy of SSIC's enrollment, LIS, and claims processing systems. However, as of January 15, 2013, SSIC's deficiencies remain unresolved. This is evidenced by SSIC's own identification of new issues as well as the daily receipt of numerous urgent complaints from its beneficiaries. Therefore, CMS concludes that SSIC has not yet fully diagnosed the root causes or the extent of its current failures, information which is critical to the development and execution of an effective corrective action plan. CMS expects that SSIC will use the enrollment and marketing suspension period as an opportunity to maintain its focus on coming into compliance promptly and ensuring that its members are consistently receiving the Part D benefits to which they are entitled.

**Legal Basis for Immediate Imposition of Marketing and Enrollment Sanctions**

As described above, since January 1, 2013, there SSIC has experienced widespread systems failures impacting its ability to correctly adjudicate Part D claims for its enrollees at the point of sale.

Therefore, CMS has determined that SSICs deficiencies provide a sufficient basis for the immediate imposition of intermediate sanctions (42 C.F.R. §§ 422.752(b) and 423.752(b)). CMS has determined that:

- SSIC substantially failed to carry out the terms of its Prescription Drug Plan contract with CMS (42 C.F.R. §423.509(a)(1)); and
- SSIC is carrying out its contracts with CMS in a manner that is inconsistent with the effective and efficient implementation of the program (42 C.F.R. §423.509(a)(2)).

*SSIC Deficiencies Create a Serious Threat to Enrollee Health and Safety*

SSIC has reported that its own records indicate that large numbers of its enrollees have been denied access to covered drugs. For example, SSIC reported to CMS on January 9, 2013, that its records show reversals of prescription drug claims for over 15,000 of its LIS plan enrollees since January 1, 2013. Claim reversals are frequently done when a beneficiary declines to have a prescription filled after being told by the pharmacist that his or her claim is denied or incorrectly adjudicated to require a higher cost-share than the beneficiary can afford.

Beneficiary access to prescribed medications is the most fundamental aspect of the Part D program because it most directly affects clinical care. The nature of SSIC's deficiencies, combined with the multiple reported instances of denied access to critical medications resulting from those deficiencies, provide a sufficient basis for CMS to find the presence of a serious threat to beneficiaries' health and safety supporting the immediate suspension of SSIC's Part D

Mr. Lloyd McDonald
January 15, 2013
Page 5 of 12

enrollment and marketing activities.  Consequently, these sanctions are effective on January 15, 2013, pursuant to the authority provided by 42 C.F.R. §423.756(c)(2).

**Corrective Action Steps**

As stated above, pursuant to 42 C.F.R. § 423.756(c)(3), the sanctions will remain in effect until CMS is satisfied that the deficiencies that are the basis for the sanction determination have been corrected and are not likely to recur.  Attached to this notice is a template Corrective Action Plan with instructions for SSIC to complete.  SSIC should submit its Corrective Action Plan to CMS seven (7) calendar days from the date of receipt of this notice, or by January 23, 2013.  If SSIC needs additional time beyond seven (7) days to submit a corrective action plan contact your enforcement lead.

The Corrective Action Plan will assist SSIC in correcting the deficiencies that are the basis for the sanction determination as quickly as possible.  The completed document will also guide communications with CMS and serve as a tool for CMS to monitor SSIC's progress.

Once SSIC has fully implemented its Corrective Action Plan and submitted to CMS an attestation from the SSIC's Chief Executive Officer, or most senior official, stating that SSIC has corrected the deficiencies that are the basis for the sanction and they are not likely to recur, validation activities will be scheduled by CMS.  CMS will provide further guidance on validation activities in a subsequent notice to SSIC.  The results of validation are used in conjunction with information gathered from SSIC's Corrective Action Plan, issues discovered during routine account management monitoring, and the identification of any additional sanction related issues to determine whether the underlying deficiencies have been corrected and are not likely to recur.

**Opportunity to Respond to Notice**

Pursuant to 42 C.F.R. § 423.756(a)(2), SSIC has ten (10) calendar days from the date of receipt of this notice to provide a written rebuttal, or by January 28, 2013.  Please note that CMS considers receipt as the day after the notice is sent by fax, e-mail, or overnight mail, or in this case, January 16, 2013.  If you choose to submit a rebuttal, please send it to the attention of Gerard J. Mulcahy at the address noted below.  Note that the sanctions imposed pursuant to this letter are not stayed pending a rebuttal submission.

**Right to Request a Hearing**

SSIC may also request a hearing before a CMS hearing officer in accordance with the procedures outlined in 42 C.F.R. § 423.650-662.  Pursuant to 42 C.F.R. § 423.756(b), a written request for a hearing must be received by CMS within fifteen (15) calendar days of receipt of this notice, or by January 31, 2013. [1]   Please note, however, a request for a hearing will not delay the date

---

[1] If the 15th day falls on a weekend or federal holiday, you have until the next regular business day to submit your request.

Mr. Lloyd McDonald
January 15, 2013
Page 6 of 12

specified by CMS when the sanction becomes effective. Your hearing request will be considered officially filed on the date that it is mailed; accordingly, we recommend using an overnight traceable mail carrier.

The request for a hearing must be sent to the CMS Hearing Office at the following address:

Benjamin Cohen
CMS Hearing Officer
Office of Hearings
ATTN:  HEARING REQUEST
Centers for Medicare & Medicaid Services
2520 Lord Baltimore Drive
Suite L
Mail Stop: LB-01-22
Baltimore, MD 21244-2670
Phone:  410-786-3169
Email:  Benjamin.Cohen@cms.hhs.gov

A courtesy copy of the request should also be sent to the following CMS Official:

Patricia Axt
Director, Division of Compliance Enforcement
Program Compliance and Oversight Group
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mail Stop: C1-22-06
Baltimore, MD  21244
Email: Trish.Axt@cms.hhs.gov
FAX: 410-786-6301

CMS will consider the date the Office of Hearings receives the e-mail or the date it receives the fax or traceable mail document, whichever is earlier, as the date of receipt of the request.  The request for a hearing must include the name, fax number and e-mail address of the contact within SSIC (or an attorney who has a letter of authorization to represent the organization) with whom CMS should communicate regarding the hearing request.

Pursuant to 42 C.F.R. §§ 423.507(b)(3) and 423.509(c) this notice also informs SSIC of its opportunity to correct the deficiencies stated in this notice.  According to our regulations, SSIC is solely responsible for the identification, development and implementation of its Corrective Action Plan and for demonstrating to CMS that the underlying deficiencies have been corrected and are not likely to recur.

Please note that we are closely monitoring your organization and SSIC may also be subject to other applicable remedies available under law, including the imposition of additional sanctions, penalties, or other enforcement actions as described in 42 C.F.R. Part 423, Subparts K and O.

Mr. Lloyd McDonald
January 15, 2013
Page 7 of 12

CMS believes these issues to be of such a serious nature that if left uncorrected, CMS will consider taking action to immediately terminate SSIC's contract.

If you have any questions about this notice, please call or email the enforcement contact provided in your email notification.

Sincerely,

/s/

Gerard J. Mulcahy
Acting Director
Program Compliance and Oversight Group

Enclosures:
Attachment A – Corrective Action Template

cc:     James McCaslin, CMS/CMHPO/Region III
        Tamara McCloy, CMS/CMHPO/Region III
        Kathleen Dombrowski, CMS/CMHPO/Region III
        John Whalen, CMS/CMHPO/Region III

Mr. Lloyd McDonald
January 15, 2013
Page 8 of 12

**Silverscript Insurance Company (SSIC)**
**Corrective Action Plan**
**For: January 15, 2013 CMS Intermediate Sanctions (Suspension of**
**Enrollment and Marketing) for Contract Number S5601**
**Submission Date:  [insert date]**
**Version Number: [insert version #]**

## Part I

Instructions: For each of the deficiencies cited in the sanction notice, please use the template below to provide *brief* summary description of what caused the deficiency, the actions being taken to correct each deficiency and ensure it is not likely to recur, and the projected timeframe for correction.

Part I must not exceed 30 pages.

**Part D Benefit**

**SSIC's deficiencies:**

1. **Failure to use point of service systems to adjudicate claims in a timely and efficient manner, in violation of 42 C.F.R. § 423.505(b)(17).**

**What Caused the Deficiency to Occur?**

[For this heading, enter a brief summarized description of the "root cause" of the deficiency that resulted from sponsor's analysis of the non-compliance in order to properly effectuate correction.]

**What Specific Actions Will Be Taken To Correct the Deficiency?**
[For this heading, enter a brief summarized statement of the corrective action(s) to be taken to correct the deficiency.]

*[Also, for any deficiencies where there was a beneficiary impact (e.g., lack of proper access to prescription drugs or health care services and/or improper cost sharing or premiums charged) noted by CMS in the Sanction Notice or where sponsor's correction action analyses efforts reveal beneficiaries were adversely affected by a particular deficiency, sponsor is expected to identify the number of beneficiaries affected by the non-compliance (modified numbers need to be provided if determined by the sponsor during the corrective action*

Mr. Lloyd McDonald
January 15, 2013
Page 9 of 12

*process to be greater than the numbers noted in the Sanction Notice), to provide CMS with information concerning what specific corrective actions will be taken to reach out to all beneficiaries that were affected by the non-compliance, and whether or not all affected beneficiaries have received the drug or health care service that should have been provided and/or have been reimbursed for any out of pocket costs or premiums improperly incurred.]*
**What Specific Actions Will Be Taken To Ensure It Is Not Likely to Recur?**
[For this heading, enter a brief summarized statement of what specific mechanisms will be instituted to ensure the deficiency is not likely to recur.]

**What is the Projected Timeframe for Correction of the Deficiency?**
[For this heading, enter the project timeframe for correcting the deficiency. Timeframes should include (at a minimum) milestones with actions planned; check-in points for demonstrable and measurable progress determinations; projected target dates (month and year); identified material weaknesses; and accountable parties.]

2. **Failure to process enrollments in a manner consistent with the requirements stated at 42 C.F.R. Subpart B, in violation of 42 C.F.R. § 423.505(b)(2).**

**What Caused the Deficiency to Occur?**

[For this heading, enter a brief summarized description of the "root cause" of the deficiency that resulted from sponsor's analysis of the non-compliance in order to properly effectuate correction.]

**What Specific Actions Will Be Taken To Correct the Deficiency?**
[For this heading, enter a brief summarized statement of the corrective action(s) to be taken to correct the deficiency.]

*[Also, for any deficiencies where there was a beneficiary impact (e.g., lack of proper access to prescription drugs or health care services and/or improper cost sharing or premiums charged) noted by CMS in the Sanction Notice or where sponsor's correction action analyses efforts reveal beneficiaries were adversely affected by a particular deficiency, sponsor is expected to identify the number of beneficiaries affected by the non-compliance (modified numbers need to be provided if determined by the sponsor during the corrective action process to be greater than the numbers noted in the Sanction Notice), to provide CMS with information concerning what specific corrective actions will be taken to reach out to all beneficiaries that were affected by the non-compliance, and whether or not all affected beneficiaries have received the drug or health care service that should have been provided and/or have been reimbursed for any out of pocket costs or premiums improperly incurred.]*
**What Specific Actions Will Be Taken To Ensure It Is Not Likely to Recur?**
[For this heading, enter a brief summarized statement of what specific mechanisms will be instituted to ensure the deficiency is not likely to recur.]

Mr. Lloyd McDonald
January 15, 2013
Page 10 of 12

### What is the Projected Timeframe for Correction of the Deficiency?
[For this heading, enter the project timeframe for correcting the deficiency. Timeframes should include (at a minimum) milestones with actions planned; check-in points for demonstrable and measurable progress determinations; projected target dates (month and year); identified material weaknesses; and accountable parties.]

3. Failure to properly administer the Low Income Subsidy (LIS) benefit, and in doing so, failure to charge LIS qualified members the reduced cost sharing amounts to which they are entitled, in violation of 42 C.F.R. § 423.800(b).

### What Caused the Deficiency to Occur?

[For this heading, enter a brief summarized description of the "root cause" of the deficiency that resulted from sponsor's analysis of the non-compliance in order to properly effectuate correction.]

### What Specific Actions Will Be Taken To Correct the Deficiency?
[For this heading, enter a brief summarized statement of the corrective action(s) to be taken to correct the deficiency.]

*[Also, for any deficiencies where there was a beneficiary impact (e.g., lack of proper access to prescription drugs or health care services and/or improper cost sharing or premiums charged) noted by CMS in the Sanction Notice or where sponsor's correction action analyses efforts reveal beneficiaries were adversely affected by a particular deficiency, sponsor is expected to identify the number of beneficiaries affected by the non-compliance (modified numbers need to be provided if determined by the sponsor during the corrective action process to be greater than the numbers noted in the Sanction Notice), to provide CMS with information concerning what specific corrective actions will be taken to reach out to all beneficiaries that were affected by the non-compliance, and whether or not all affected beneficiaries have received the drug or health care service that should have been provided and/or have been reimbursed for any out of pocket costs or premiums improperly incurred.]*

### What Specific Actions Will Be Taken To Ensure It Is Not Likely to Recur?
[For this heading, enter a brief summarized statement of what specific mechanisms will be instituted to ensure the deficiency is not likely to recur.]

### What is the Projected Timeframe for Correction of the Deficiency?
[For this heading, enter the project timeframe for correcting the deficiency. Timeframes should include (at a minimum) milestones with actions planned; check-in points for demonstrable and measurable progress determinations; projected target dates (month and year); identified material weaknesses; and accountable parties.]

Mr. Lloyd McDonald
January 15, 2013
Page 11 of 12

## PART II

Instructions: Using the projected timeframes provided above, create a timeline reflecting all planned corrective action.  This timeline will be a detailed outline of a plan of action to correct all noted deficiencies.  It should include (at a minimum) milestones with actions planned, projected completion dates, and accountable parties.

| Deficiency # (from Part I) | Milestone/Activity Description | Accountable Parties | Projected Completion Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## Corrective Action Documentation Submitted By:

[Name]
[Title]
[Company]
[Address]
[Phone Number]
[Email Address]

Mr. Lloyd McDonald
January 15, 2013
Page 12 of 12

_____              _____
**(Signature)**                                      **(Date)**

# LOONEY DECLARATION

# EXHIBIT C

## KEY EMPLOYEE AGREEMENT

In consideration of my employment by Merck-Medco Managed Care, L.L.C., and/or any of its corporate parents, subsidiaries, divisions or affiliates, or the successors or assigns of any of the foregoing (hereinafter collectively referred to as "Employer"), I hereby agree as follows:

1. <u>Property Rights</u>. All data, concepts, ideas, designs, findings, discoveries, inventions, improvements, advances, methods, formulas, plans, programs (computer or otherwise), practices, techniques, developments and relationships with customers and prospective customers relating in any way to the present and/or contemplated products, services, or business of the Employer (collectively "Developments") that I may conceive, make, invent or suggest during or as a result of my employment by the Employer, whether acting alone or in conjunction with others, shall be the sole and absolute property of the Employer free of any rights of any kind on my part. I will promptly make full disclosure of all Developments to the Employer. I agree to do all acts and things (including, among others, the execution and delivery of patent and copyright applications and instruments of assignment) deemed by the Employer to be necessary or desirable at any time in order to effect the full assignment to the Employer of my rights, if any, to such Developments.

2. <u>Covenant Against Use and Disclosure</u>. I recognize that in connection with my employment, I may learn of, and/or it may be desirable or necessary for the Employer to disclose to me confidential information ("Confidential Information"). I understand that Confidential Information is valuable and proprietary to the Employer (or to third parties that have entrusted the Confidential Information to the Employer). I agree that, except as required by my employment with the Employer, I will not at any time, directly or indirectly, use, publish, communicate, describe, disseminate, or otherwise disclose Confidential Information to any person or entity without the express prior written consent of the Employer. The term Confidential Information shall include, but shall not be limited to: (a) customer lists, lists of potential customers and details of agreements with customers; (b) acquisition, expansion, marketing, financial and other business information and plans of the Employer; (c) research and development; (d) data concerning usage of prescription drugs and any other data compiled by the Employer; (e) computer programs; (f) sources of supply; (g) identity of specialized consultants and contractors and Confidential Information developed by them for the Employer; (h) purchasing, operating and other cost data; (i) special customer needs, cost and pricing data; (j) employee information (including, but not limited to, personnel, payroll, compensation and benefit data and plans); and (k) patient records and data, including all such information recorded in manuals, memoranda, projections, minutes, plans, drawings, designs, formula books, specifications, computer programs and records, whether or not legended or otherwise identified by the Employer as Confidential Information, as well as such information that is the subject of meetings and discussions and not recorded. Confidential Information shall not include such information that is generally available to the public (other than as a result of a disclosure by me or others in violation of law or agreement) or that is disclosed to me by a third party under no obligation to keep such information confidential.

3. <u>Return of Documents</u>. Upon the termination of my employment with the Employer or upon the Employer's request, whichever is sooner, I shall immediately deliver to the Employer all plans, designs, drawings, specifications, listings, manuals, records, notebooks, computer memory, disks or programs, and similar repositories of or containing Confidential Information or other data relating to the Employer's products, services, or business then in my possession or control or available from other persons receiving such documents from me, whether prepared by me or others. I shall not retain any copies or abstracts of any such documents.

4. <u>Restrictions on Competitive Employment</u>. During my employment, and for a period of twelve (12) months following the termination of my employment, I will not (as an individual, principal, agent, employee, consultant, or otherwise), directly or indirectly in any territory in which the Employer and/or any of its affiliates does business and/or markets its products and services, engage in activities competitive with, nor render services to any firm or business engaged or about to become engaged in the Business of the Employer. The Business of the Employer includes, but is not limited to, the following businesses: (i) the third party prescription drug claims processing business; (ii) the design, development or marketing of or consulting as to, prescription drug benefit plans; (iii) the provision of mail service pharmacy (including all those products and services that are presently or hereafter marketed by the Employer, or that are in the development stage at the time of termination of my employment and are actually marketed by the Employer and/or its affiliates thereafter); (iv) the collection, analysis and/or sale of data relating to prescription drug utilization; (v) the pharmacy benefit management and disease management businesses; (vi) the

organization and administration of retail pharmacy networks; and (vii) any other business in which the Employer and/or any of its affiliates is then engaged as to which I have involvement in the course of my employment hereunder and/or acquired or received Confidential Information, (hereinafter collectively, the "Business of the Employer"). In addition, I will not have an equity interest in any such firm or business other than as a 1% or less shareholder of a public corporation. The restrictions contained in this paragraph 4 shall not extend to pharmaceutical manufacturers, other than those entities which include businesses competing with Merck-Medco Managed Care, L.L.C. or its subsidiaries.

5.  Restrictions Against Solicitation and Inducement. During my employment and for a period of twelve (12) months following the termination of my employment, I will not, directly or indirectly: (i) solicit or contact any customer or targeted potential customer of the Employer and/or its affiliates upon whom I called or whom I solicited or with whom I became acquainted after commencement of my employment; (ii) induce or attempt to induce, any employees, agents or other consultants of the Employer and/or its affiliates to do anything from which I am restricted by reason of this Agreement; (iii) offer or aid others to offer employment to any employees, agents, or consultants of the Employer and/or its affiliates; or (iv) provide services to any customer or otherwise interfere with or disrupt any contractual or potential contractual relationship between any customer and the Employer and/or its affiliates.

6.  Compliance Not Contingent Upon Additional Consideration. I have not been promised, and I shall not claim, any additional or special payment for any of the covenants and agreements contained in this Agreement.

7.  Employment Status. This Agreement does not constitute a contract of employment or an implied promise to continue my employment or status with the Employer; nor does this Agreement affect my rights or the rights of the Employer to terminate my employment status at any time with or without cause.

8.  Severability. I acknowledge that the terms of this Agreement are fair and reasonable at the date signed by me. However, in light of the possibility of a change of conditions or differing interpretations by a court of what is fair and reasonable, I agree that if any one or more of the terms, provisions, covenants, or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the terms, provisions, covenants, and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated. Further, if any one or more of the terms, provisions, covenants or restrictions contained in this Agreement shall for any reason be determined by a court of competent jurisdiction to be excessively broad as to duration, geographical scope, activity, or subject, it shall be construed, by limiting or reducing it, so as to be enforceable to the maximum extent compatible with then applicable law.

9.  Successors and Assigns. This Agreement shall be binding upon my heirs, executors, and administrators, and shall inure to the benefit of and be binding upon the successors and assigns of the Employer.

10.  Non-Waiver/Remedies. Any waiver by the Employer of a breach of any provision or covenant in this Agreement shall not operate or be construed as a waiver of any subsequent breach or of any rights which the Employer may otherwise have. I acknowledge that breach of this Agreement would cause grave and irreparable injury to the Employer that would not be compensable in money damages, and therefore, in addition to the Company's other express or implied remedies, the Company shall be entitled to injunctive and other equitable relief to prevent any actual intended or likely injuries that may result from such breach. However, nothing in this Agreement shall limit any other right or remedy to which the Employer may be entitled.

11.  Governing Law. This Agreement shall be construed in accordance with and governed for all purposes by the laws and public policy of the State of New Jersey, without regard to principles of conflict of laws.

_Witness_

_6-22-98_
Date

_Employee_

Print Name: _Joseph Marinelli_

Form: 12764_1

# LOONEY DECLARATION

# EXHIBIT D

# PROPOSED COVENTRY HEALTH CARE JOB PROFILE

Last Updated: XX/XX/XX

| TITLE  Vice President, Part D Operations | JOB CODE | 735121 |
|---|---|---|
| JOB FUNCTION PART D Operations - Government Programs | FLSA STATUS | Exempt |
| LOCATION  Philadelphia PA or Bethesda, MD | | |

### GENERAL SUMMARY

This position is responsible for the day to day operations of the stand-alone PDP as well as the Prescription Drug component of Coventry CCP plans.  Responsible for the planning, development, and management of a cross functional, multi-skilled government program unit that contributes to the profitability of Medicare Products. Responsible for managing multifaceted Part D initiatives.

| ESSENTIAL RESPONSIBILITIES | % of Time Spent |
|---|---|
| • Directs and manages Medicare Part D operational functions including but not limited to; Plan Benefit Package process, annual member materials, CMS and organization Part D data reports, clinical quality and performance management. | |
| • The role is responsible for working with Actuarial to set up and maintain benefits, create source configuration files that drive enrollment systems and billing.  The staff also works closely with the PBM ( as part of delegated oversight) and the CVH Pharmacy Mgmt group on formulary design/ clinical rules to ensure compliance with all CMS requirements, as well as the testing of all formularies and pharmacy network participation. | |
| • Oversee the planning, development, implementation, monitoring and management of Part D operations initiatives, controls and metrics to comply with applicable statutory and regulatory mandates and ensure that operational units consistently achieve compliance with Federal and state mandates as they apply to Part D operations. | |
| • Communicates the significance of corporate policy and strategy as it relates to all government programs and products. | |
| • Develops and manages the department budget.  Controls expenses while meeting SG&A budget demands and must work collaboratively with Sales & Marketing as well as our Customer Service Organization & IT to ensure compliant and financially prudent service delivery as well as distribution through various channels to produce acceptable Cost per Lead/ Cost per sale for PDP. | |
| • Serves as subject matter expert to business units and delegated entities relating to Medicare Advantage Part D regulatory requirements.  Conduct research, perform analysis and provide appropriate recommendations/responses. | |
| • Work with business units and/or delegated entities, as necessary, to implement change as a result of CMS regulatory requirements and/or identified issues. | |
| • Ensure accuracy of CMS Part D required reports including verification of source components produced by the PBM and other applicable first tier downstream and related entities (FDRs), information, data and member materials prior to CMS submission, and member mailing. | |
| • Accountable for driving improved quality, working collaboratively with Internal Performance Management (Stars team), Corporate QI (HEDIS), and Pharmacy Management (Patient Safety). | |
| • Understand Coventry's business processes, systems, tools, regulations and structure and how they interrelate to provide products and services that create value for the members and key stakeholders | |

| | |
|---|---|
| • Identify, select, and retain diverse talent, capitalizing on competencies, ideas and passion. This position will be responsible for aligning talent with key components of the business strategy, creating value for all stakeholders; and assessing, developing and rewarding talent, encouraging progression throughout the organization | |
| • Performs other duties as required. | |

## JOB SPECIFICATIONS

**Job Specification Summary** – This position requires an intimate knowledge and ongoing monitoring of the CMS Part D regulations, strong track record of leading complex operations where quality & accuracy requirements are exceptionally high, the maintenance of a complex infrastructure that drives highly accurate transactions, required communications, reporting, financial drivers, and compliance metrics.

Bachelor's degree or equivalent experience, Master's degree preferred

Significant regulatory experience required with a minimum of 10 years solid operations background, a track record of building high performance teams and ability to work collaboratively in a team-oriented, and matrixed organization.experience in government programs division

Previous (5-7 years) management experience required.

Experience with control structures, checks & balances, and re-engineering to improve automation and efficiency is highly desirable.  Six Sigma may be beneficial.

Background in leading Medicare & Part D operations is also desirable.

Must be a highly energetic leader

In-depth experience with regulated lines of business and of managed care policy and direction.

Strong communication and negotiation skills.

Ability to perform analysis and legal research to identify and clarify issues

Excellent team player and leadership skills.

Excellent interpersonal skills and effective communication and presentation skills.

Able to effectively coordinate multiple projects.

Proficient with PC applications.

Problem solver

DISCLAIMER:  The above statements are intended to describe the general nature and level of work being performed by individuals assigned to this position.  They are not intended to be construed as an exhaustive list of responsibilities, duties and skills required of personnel so classified.

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of February, 2013, a copy of the foregoing was mailed by United States Postal Service, first class mail, postage prepaid, to Jennifer B. Rubin, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 707 Summer Street, Stamford, CT 06901, Attorney for Plaintiff Joseph Marinelli.

/s/ Stephen P. Rosenberg
Stephen P. Rosenberg
Federal Bar No. CT26601