# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH MARINELLI,
     Plaintiff,

     v.

MEDCO HEALTH SOLUTIONS, INC. d/b/a
EXPRESS SCRIPTS, INC.,
     Defendant.

No. 3:13cv199 (MPS)

## MEMORANDUM OF DECISION

This dispute calls on the Court to determine whether a non-compete clause is enforceable under New Jersey law. In January 2013, Plaintiff Joseph Marinelli, a longtime employee of Defendant Medco Health Services ("Medco"),[1] resigned his position with Medco and began working at Coventry Health Care ("Coventry") as its Vice President of Medicare Part D Operations. After Medco indicated that it considered Mr. Marinelli's joining Coventry to be a breach of his contract with Medco, Mr. Marinelli initiated this suit for declaratory relief in Connecticut Superior Court against Medco on February 6, 2013, seeking a declaration that the non-compete clause in his contract with Medco was not enforceable against him with respect to his new position at Coventry. On February 13, 2013, Medco filed a timely Notice of Removal [Dkt. # 1] and a Counterclaim [Dkt. # 6] against Mr. Marinelli for allegedly breaching the non-compete clause in his employment contract. Shortly thereafter, Medco filed a Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. # 16].[2] After denying Medco's

---

[1] The Court uses "Medco" as a shorthand to refer collectively to Counterclaim Plaintiffs Medco Health Solutions, Inc., Express Scripts Holding Company, Medco Health Services, Inc., and Express Scripts Inc. Express Scripts acquired Medco on April 2, 2012. (Hr'g Tr. [Dkt. # 65] at 58.)

[2] On February 28, 2013, the Court held a telephonic status conference and, in light of the representations by Mr. Marinelli's counsel that Mr. Marinelli would agree to abide by a

request for a temporary restraining order, the Court held a hearing on the motion for a preliminary injunction on April 16, 2013.

Having carefully considered the exhibits and testimony offered at the preliminary-injunction hearing, the Court concludes that, with respect to the non-compete clause, Medco has not met its burden to make a clear or substantial showing that it is likely to succeed on the merits. Under New Jersey law, covenants not to compete are enforceable only to the degree that they are reasonably tailored to protect the legitimate interests of an employer.  As discussed below, the Court finds that (1) Mr. Marinelli was merely exposed to, rather than intimately familiar with, certain confidential and protectable information; (2) Mr. Marinelli's new job responsibilities at Coventry entail little risk of disclosure, a risk that is further reduced by the existing injunction; (3) in seeking to enforce the non-compete clause, Medco was motivated by its desire to keep a highly competent employee rather than by a legitimate concern about protecting confidential information; and (4) enforcing the non-compete agreement here would impose undue hardship on Mr. Marinelli.  In light of these findings, the Court concludes that Medco has failed to establish a likelihood of demonstrating that the non-compete clause at issue is reasonable as applied to Mr. Marinelli's job at Coventry.  Although the Court denies Medco's request for a preliminary injunction as to the covenant not to compete, the Court will maintain the stipulated temporary injunction currently in place.  This injunction—which bars Mr. Marinelli from disclosing confidential information—is sufficient to protect Medco's legitimate interests in

---

stipulated temporary restraining order proscribing his use of enumerated confidential information, the Court denied Medco's motion for a temporary restraining order.  (*See* Order [Dkt. # 35]; Minute Entry [Dkt. # 34].)  On March 6, 2013, the parties proposed—and on March 7, 2013, the Court so ordered—a stipulated temporary injunction barring Mr. Marinelli from using or disclosing certain confidential information specified therein.  (*See* Order [Dkt. # 38].)

guarding its proprietary information.   As such, Medco's request for a preliminary injunction is granted in part and denied in part.

## I.    Findings of Fact

The following findings of fact are based on the exhibits and testimony presented during the April 16, 2013 hearing on Medco's motion for a preliminary injunction.   Four witnesses testified at the hearing: Brenda Jackson, who replaced Mr. Marinelli as Senior Director of Enrollment Operations at Medco; Britton Pim, the General Manager of Medco's Government Programs Division; Nancy Cocozza, Senior Vice-President of Medicare at Coventry; and Mr. Marinelli.

### A.    Medicare Part D

Medicare Part D, a federal drug benefit created in 2003, provides Medicare beneficiaries with insurance coverage for prescription drugs.   Under Part D, beneficiaries can obtain prescription drug coverage individually or through their employers.[3]   Some Medicare Part D prescription drug plans ("PDPs," for short) are marketed and sold directly to individual consumers on a public exchange.   Employer Group Waiver Plans (known as "EGWPs") are marketed and sold to employers for the exclusive benefit of their employees or retirees.   Both Medco and Coventry offer EGWPs and PDPs, although Medco largely offers the former, and Coventry almost exclusively the latter.[4]

---

[3]  As Mr. Pim explained: "[T]here's two primary segments for a Part D plan.   An individual market, if you have parents that are eligible for Medicare, there's an annual process in the fall where you enroll in a plan. There's another segment . . . where an employer, UAW Trust or some other large retiree system, could sponsor a Part D plan just for those retirees that wouldn't be available to anybody else . . . ." (Hr'g Tr. at 59.)

[4]   Medco provides prescription drug coverage to approximately 2.2 million individuals through its EGWPs and approximately 500,000 people through individual PDPs.   (*Id.* at 60.) Individual PDPs constitute Coventry's core business, while EGWPs constitute less than 1% of its plans' total membership.   (*Id.* at 131.)   Mr. Marinelli has argued that the competitive overlap

The Centers for Medicare and Medicaid Services ("CMS"), a branch of the U.S. Department of Health and Human Services, administers the Medicare Part D prescription drug program. CMS does not implement the various plans; rather, private companies design, sponsor, and implement PDPs that must comply with CMS's publically available regulations and guidance. The applicable regulations evolve rapidly, as CMS changes its guidance frequently, with updates issuing "several times a day." (Hr'g Tr. at 50.) Furthermore, the extent and nature of CMS's regulations differ for individual PDPs and EGWPs. (*See* Hr'g Tr. at 132-33.)

For healthcare companies like Medco and Coventry, compliance with CMS's regulations is of paramount importance. For example, for individual PDPs, CMS assigns each plan an overall quality rating—from one to five stars—based on its assessment of various measures of plan performance, including member experience, pricing, patient safety, customer service, and member complaints. High-rated plans receive bonus payments from the government, while low-rated plans are subject to sanctions, including being barred by CMS from enrolling new beneficiaries. (Hr'g Tr. at 62, 79.) In addition, a plan's star rating is made available to beneficiaries, who may take account of the rating in making their decision to enroll in a particular PDP.

To sell individual PDPs, Medco and Coventry are required to engage in a bidding process. Each company submits a bid for contracts with CMS on an annual basis. If the

between the two firms is thus quite limited. Medco countered by introducing evidence that Coventry has agreed to be acquired by Aetna and that Aetna views EGWPs as a key growth area. (*Id.* at 61, 76-77.) The Aetna evidence, however, lacks necessary specifics. First, although the merger is expected to become final within the year, as of the April 16 hearing, it was "in the hands of regulators." (Hr'g Tr. at 146.) It is therefore uncertain whether the merger will be effected before Mr. Marinelli's non-compete obligations expire, i.e., on January 18, 2014. Second, Medco failed to introduce any details of Aetna's EGWP business. As such, the Aetna merger, though not irrelevant, does not warrant much weight in the Court's decisionmaking.

company's bid is approved, it enters into a contract with CMS that permits the company to market and sell individual PDPs.

### B.      Medco and Coventry

In addition to sponsoring both individual PDPs and EGWPs, a major component of Medco's business is the provision of pharmacy benefit management ("PBM") services to employers, health plans, labor unions, government agencies, and individuals.  Medco gives operational support to organizations that provide prescription drug coverage—including other plan sponsors—and offers services that include network pharmacy claims processing, mail pharmacy services, specialty pharmacy services, specialty benefit management, benefit design consultation, drug-utilization review, formulary management (e.g., figuring out which drugs to offer), and retail pharmacy network development.

One of Medco's top PBM clients is Coventry.  Even though the companies compete in the individual-PDP market, Medco provides pharmacy benefit management services to Coventry for Coventry's Medicare Part D prescription drug plans.[5]

Medco regularly shared—and continues to share—with Coventry and its other PBM clients various best practices regarding compliance.  For example, Medco conducts "Stars summits" to share information about improving operations to help its clients better their CMS Star Ratings.  (Hr'g Tr. at 136.)   Medco also specifically shared with its PBM clients its processes, procedures, and methods for complying with CMS reporting requirements, maximizing claims processing, monitoring fraud and waste, and obtaining a high score under CMS's Star Rating System. When Mr. Marinelli was still working for Medco, management

---

[5] In fact, as it happens, one of Mr. Marinelli's responsibilities in his new job with Coventry is to ensure that both Medco and Coventry are performing their contractual obligations under the companies' PBM contract.

instructed him to share its best practices about how to perform enrollment premium billing with Coventry.  (Hr'g Tr. at 174.)  No one from Medco's leadership team instructed Mr. Marinelli not to share details about Medco's operational processes or any other information during these meetings.  (Hr'g Tr. at 223.)

### C.    Mr. Marinelli

#### 1.    The Employment Contract and Non-Compete Clause

When Mr. Marinelli began his employment as a business analyst with a predecessor of Medco in 1998, he signed the contract that is the subject of this suit—the "Key Employee Agreement." (Ex. 508.)  This agreement includes a non-compete clause stating as follows:

> [F]or a period of twelve (12) months following the termination of my employment, I will not (as an individual, principal, agent, employee, consultant or otherwise), directly or indirectly . . . engage in activities competitive with, nor render services to any firm or business engaged or about to become engaged in the Business of the Employer.  The Business of the Employer includes . . . (ii) the design, development or marketing of or consulting as to, prescription drug benefit plans . . . .

(*Id.*)

The Key Employment Agreement also includes a nondisclosure covenant, which provides in relevant part:

> I agree that, except as required by my employment with the Employer, I will not at any time, directly or indirectly, use, publish, communicate, describe, disseminate, or otherwise disclose Confidential Information to any person or entity without the express prior written consent of the Employer. The term Confidential Information shall include, but shall not be limited to: (a) customer lists, lists of potential customers and details of agreements with customers; (b) acquisition, expansion, marketing, financial and other business information and plans of the Employer; (c) research and development . . . . Confidential Information shall not include such information that is generally available to the public (other than as a result of a disclosure by me or others in violation of law or agreement) or that is disclosed to me by a third party under no obligation to keep such information confidential.

(*Id.*)   In addition, Mr. Marinelli signed an agreement entitled "Confidentiality of Company Records & Documents" that imposed further confidentiality obligations.  (*See* Ex. 507.)

None of these agreements includes any "safety net" or other feature protecting the employee from the prospect of unemployment in the event he or she is unable to find work without violating the literal terms of the agreement.  *Cf. Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 482 (D.N.J. 1999) (observing that under the non-compete clause at issue, the plaintiff-employer agreed to pay all of the defendant-employee's base salary lasting for the duration of the non-compete provision or until the defendant-employee found a suitable position).

### 2.  Job Duties with Medco

After joining Medco as a business analyst, Mr. Marinelli received multiple promotions within the company.  After Medicare Part D was enacted, Marinelli became responsible for overseeing information technology projects and implementing processes and procedures for complying with the Medicare Part D regulations.  In 2009, Mr. Marinelli became Senior Director for Enrollment Operations at Medco.

As Senior Director of Enrollment Operations—a position currently held by Brenda Jackson, who testified at the hearing—most of Mr. Marinelli's job was dedicated to enrollment, premium billing, and related customer service activities. (Hr'g Tr. at 169; *see also id.* at 11-12, 153-54, 200-02.)  These responsibilities extended to managing the operations for both EGWPs and individual PDPs.  (*Id.*)  To perform his job, Mr. Marinelli needed to know the number of enrollees in Medco's plans—and the pipeline of expected future enrollment—because the number of enrollees and prospective enrollees affected operational staffing.

Mr. Marinelli managed Medco's relationship with two outside vendors to which Medco outsourced its Medicare Part D operations and compliance activities: TMG Health and Global Pharmaceutical Solutions.[6]  For example, Mr. Marinelli managed a team of approximately 150 TMG Health employees who performed back-office operations to support enrollees, including answering membership questions and complaints from a call center, processing enrollment applications, and sending applications to the government.

Finally, Mr. Marinelli was responsible for a process called reconciliation and for ensuring that Medco was compliant with the applicable Medicare Part D regulations.  According to the evidence presented at the hearing, reconciliation entails synchronizing key data with the government to ensure that the plan sponsor—here, Medco—obtains proper reimbursement.[7]  Mr. Marinelli was also responsible for regulatory compliance.  As Ms. Jackson explained, "[a]ny time new guidance comes out relative to CMS, changes from a Medicare perspective either for enrollment, grievance, complaint, tracking, things of that nature, it's our responsibility to ensure that we review that guidance, that we're interpreting it appropriately."  (Hr'g Tr. at 12.)  Mr. Marinelli analyzed and interpreted CMS regulations and guidance, provided operational updates to CMS's regional office, and oversaw CMS audits.

### 3.    Exposure to Information at Medco

Plaintiff has not retained possession or control of any of Medco's confidential documents.  (Hr'g Tr. at 185.)  As such, the only confidential information at risk of disclosure or use is information that Mr. Marinelli remembers.  As part of his job, Mr. Marinelli was exposed

---

[6]  Unlike Medco, Coventry does not outsource its PDP operations.

[7]  Mr. Marinelli described reconciliation in the following way: "It's both money and membership.  There's lots of details that [PDP sponsors] exchange with the government. The government will say [a beneficiary] is at a certain income level and should be offered certain subsidies.  So there are a number, I'll call them data points, that we'll have to synchronize. Money is one of them.  Then there's other benefit information."  (Hr'g Tr. at 153.)

to certain categories of corporate information that Medco seeks to protect as confidential: (1) client information, (2) Medco's business strategy, and (3) certain business processes for complying with CMS regulations.[8]   Though exposed to confidential information, Mr. Marinelli did not, by virtue of his role as Medco's Senior Director of Enrollment Operations, create such information or work with such information on a daily basis.   The Court's findings as to the details of Mr. Marinelli's exposure to these three categories of confidential information are set forth below.

First, Mr. Marinelli had only limited exposure to confidential information relating to existing or prospective customers.   Medco's customers generally communicated with their account managers at Medco, and then with client solutions managers.   Only if customer issues were not resolved by those two layers of contact would Mr. Marinelli have direct client contact. On occasion, Mr. Marinelli also attended meetings with prospective EGWP clients to respond to operational questions once a sale was near final, as he did before Medco finalized an EGWP contract with the UAW Trust.[9]   Finally, by virtue of his operational responsibilities, Mr.

---

[8] Medco also suggests that Mr. Marinelli has confidential information regarding vendor management, based on his role overseeing the third-party vendors TMG Health and Global Pharmaceutical Solutions.   As Coventry, unlike Medco, does not outsource its compliance operations, there is no reason to believe that Mr. Marinelli is likely to disclose this information to his new employer, and the Court does not make detailed findings about the scope of Mr. Marinelli's exposure to putatively confidential information about third-party vendors.

[9] Medco's attempts to use this particular transaction with the UAW Trust to demonstrate that Mr. Marinelli was a key salesman are unconvincing.   According to Ms. Jackson's testimony, Steve Wogen, Mr. Marinelli's boss, made the actual sale, and Mr. Marinelli "became involved later on in finalizing things, responding to questions, getting things firmed up."  (Hr'g Tr. at 54.) This version makes sense: for a large sale, a prospective client may want to do its due diligence to make sure that Medco has the operative capacity to fulfill its obligations.   The fact that Mr. Marinelli, as a go-to operations employee, attended a meeting to allay the concerns of a prospective EGWP client does not, by itself, transform Mr. Marinelli into a person holding the type of intimate knowledge of a prized customer relationship that could pose a threat to Medco if it fell into the hands of a competitor.   It is also worth noting, again, that EGWPs such as the UAW Trust represent less than 1% of Coventry's business.

Marinelli knew the names of some of Medco's prospective EGWP clients.  (Hr'g Tr. at 201-02.) If Medco was about to sponsor a large EGWP, then Mr. Marinelli had to make sure that Medco was able to scale up its operational capacity to service the new batch of beneficiaries—e.g., by hiring additional call staff to handle the new enrollees' questions about their coverage.  Mr. Marinelli thus had access to the pipeline of Medco's prospective EGWP clients, including its top ten targets.  His job was not, however, focused on marketing or selling to customers or developing strategies to win customers away from competitors.

Second, with respect to business strategy, Mr. Marinelli had some—albeit limited— access to strategic planning information, including Medco's bid strategy regarding the individual PDPs that Medco would propose to sponsor in CMS's annual bidding processes.  Although Mr. Marinelli was exposed to various planning documents, he did not create those documents or play an integral role in the company's strategic planning and does not maintain continuing familiarity with Medco's strategic direction.[10]  The Court found Mr. Marinelli to be credible when he testified that, "What I did was I focused on my role.  And so I didn't focus ever on the bid, product development, product management.  So I don't come with any knowledge of Medco['s] . . . bid [or] their product development."  (Hr'g Tr. at 170.)[11]  Because Mr. Marinelli did not create Medco's strategic planning information and because his job at Medco did not entail

---

[10]  Medco argues that Mr. Marinelli was a member of the so-called "PDP Leadership Team," and was therefore required to participate in weekly meetings at which confidential business information was discussed.  The Court, however, credits Mr. Marinelli's testimony that these meetings were essentially regular staff meetings at which employees shared updates on projects and current events.  (Hr'g Tr. at 178.)

[11]  Medco relies heavily on the fact that strategic planning information was e-mailed to Mr. Marinelli.  (*See, e.g.*, Exs. 501, 502; Hr'g Tr. at 23-24.)  But Mr. Marinelli usually received in excess of 200 e-mails per day.  Under these circumstances, receipt of an e-mail containing or attaching confidential information cannot, by itself, be the basis for a finding of a significant risk that the recipient viewed that information, remembers it, and will disclose it to his new employer.

working with such information on a day-to-day basis, the Court finds credible his testimony that he does not now maintain a continuing familiarity with Medco's strategic plans.

Third, Medco has failed to adduce evidence that Mr. Marinelli walked away from Medco with specific, *protectable* business information derived from his day-to-day activities in managing various compliance-related processes. A favorite refrain of Medco's witnesses was that compliance procedures were ingredients in the "secret sauce" that makes Medco successful. (Hr'g Tr. at 40, 69.) Repeating a catch phrase, however, is not a substitute for making an evidentiary showing that the processes known to Mr. Marinelli are, in fact, protectable. Medco failed to make this showing. The only specific example provided was Mr. Pim's testimony that Medco has developed, in the context of EGWPs, "very specific processes in the way [it] manage[s] the enrollment and eligibility process" that minimize the likelihood that a beneficiary will be subject to a late enrollment penalty. (Hr'g Tr. at 72.) As previously discussed, however, Medco did not treat its Medicare Part D compliance processes and procedures as confidential; rather, Medco regularly shared with its PBM clients including Coventry its processes and procedures relating to compliance. (*See, e.g.*, Hr'g Tr. at 174, 223.) To the extent that Medco's business processes are based on proprietary algorithms concerning staffing and cost containment—rather than generalized concepts that Medco has not demonstrated are even remotely protectable—there is no evidence that Mr. Marinelli knows the algorithms. (*See* Hr'g Tr. at 108.)

### 4. Job Duties with Coventry

In January 2013, Mr. Marinelli joined Coventry as its Vice President of Medicare Part D Operations. In his new role, Mr. Marinelli is in charge of complying with Medicare Part D reporting requirements, preparing for CMS's annual data validation audit, stewarding Coventry's

annual benefit process, managing the data involved in the PDP bidding process, and ensuring that Coventry and Medco are both performing their obligations under their PBM contract. (Hr'g Tr. 137, 167-68.)

What Mr. Marinelli does not do at Coventry is as or more important than what he does do.   First, although Mr. Marinelli manages some of Coventry's PDP bidding data, his role with the PDP bidding process has nothing to do with setting the terms of Coventry's actual bid.  (*See* Hr'g Tr. at 168 ("I'm not in charge of anything related to the actual bid, the pricing, the medications known as the formulary, none of those things. But I'm in charge of all of the data as it is keyed into the government system and pulled back out.").)  Second, Mr. Marinelli does not manage any third-party vendors, because, as noted, Coventry does not outsource its PDP operations.  (Hr'g Tr. at 137, 169.)  Third, Mr. Marinelli is not responsible for assisting in the marketing or sale of Coventry's PDPs and does not solicit business from any customers.   (Hr'g Tr. at 168.)   Fourth, information about Medco's pipeline of EGWP customers is largely, if not completely, immaterial, to Coventry, as it primarily sponsors individual PDPs rather than EGWPs.[12]  Fifth, the information in Medco's three-year PDP business strategy plan contained no information that Mr. Marinelli needs to perform his job duties at Coventry.  Sixth, Coventry uses entirely different software for processing applications, enrolling new members, billing, and the like.  In sum, notwithstanding a similar sounding job title, Mr. Marinelli's job at Coventry is quite different from his job at Medco.

---

[12] *See* note 4, *supra* (noting that the evidence in the record regarding the Aetna-Coventry merger is not sufficiently detailed and specific to affect the Court's analysis, even though Aetna may have a more active EGWP business than Coventry).

### 5.      The Events Leading to This Lawsuit

After Express Scripts acquired Medco in April 2012, there were significant layoffs in

Medco's New Jersey offices, where Mr. Marinelli worked.  Specifically, Medco laid off 30-50%

of its employees in New Jersey.  (Hr'g Tr. at 164.)  Mr. Marinelli reasonably feared for his job

and worried about salary reductions.  (*Id.*)  Moreover, management had guaranteed significant

severance benefits only until April 2013.  (*Id.*)  As a result, Mr. Marinelli decided to look for

other job opportunities and, with the assistance of a recruiter, began substantive conversations

with Coventry about joining it as its Vice President of Medicare Part D Operations.

After Coventry hired Mr. Marinelli in early 2013, representatives of Coventry and Medco

held a telephone call to discuss the hiring decision and Medco's concomitant concerns.  Among

others, Ms. Cocozza (the Senior Vice-President of Medicare at Coventry) and Britt Pim (the

General Manager of Medco's Government Programs Division), both of whom testified at the

hearing, participated in the call.  In light of its importance, the Court recounts large excerpts of

Ms. Cocozza's testimony about the call, which the Court found to be candid and credible:

> [T]he purpose of the call was for me to explain to [Medco] the nature of the
> position that [Mr. Marinelli] would be filling and why the role that, you know, he
> was filling for us really didn't—shouldn't be interpreted as a competitive threat to
> [Medco].  So we had a call to talk about the role and responsibility that [Mr.
> Marinelli] would be assuming at Coventry and tried to, you know, find a solution
> that would alleviate their concern.

(*Id*. at 140.)  Describing Mr. Pim's reaction during the call, Ms. Cocozza continued:

> I explained the role that [Mr. Marinelli] would be undertaking. We had shared the
> job description with [Medco] earlier.  And I had heard just through conversation
> that [Medco] had been concerned particularly about Star Ratings.  And I was
> incredulous about this because we, in essence, rely on them to help us achieve the
> very best Star Ratings.  And I did say specifically, I asked specifically if their
> concern was Star Ratings because I couldn't see how they could be, in essence,
> paid by us to help us with Star Ratings and, you know, and now be feeling like
> there was some proprietary special sauce or whatever that they wouldn't share
> with us.  And Britt [Pim] assured me that was not the case. That his concern was

> not at all about Star Ratings and went further to say that his concern was less about [Mr. Marinelli] as a person and really -- less about [Mr. Marinelli] per se and the situation with [Mr. Marinelli] per se, but the need for [Medco] to try to protect its assets, its personnel assets.  And it had more to do with just [Mr. Marinelli's] general competencies and his ability to execute than it did with any specific aspects of the job.

(*Id.* at 140-41.)

This testimony undermines Medco's motion in two ways.  First, it confirms that the compliance process information with which Mr. Marinelli was most familiar from his work at Medco—including information regarding "star ratings"—was specifically and continuously shared with Coventry as part of its customer relationship with Medco, and that Medco therefore was *not* concerned about Mr. Marinelli's disclosure of such information to Coventry.  Second, it establishes that Medco did not want Mr. Marinelli to join Coventry for two overlapping reasons: Medco did not want to lose a valuable employee (*see id.* at 141 (noting that Medco's "biggest concern" was losing Mr. Marinelli's  "overall competency")), and it did not want a competitor to gain a valuable employee.  The Court finds it noteworthy that Mr. Pim's testimony at the preliminary-injunction hearing contains variations on the theme described by Ms. Cocozza.  For example, Mr. Pim testified that

> [W]e are the highest rated national PDP, and I believe that gives us a competitor advantage in the market in terms of trying to attract new beneficiaries.  So if someone were to leave our company and go to a competitor and just, as part of their daily job, identify improvement opportunities that allowed them to improve their Star Rating it's going to erode my competitive lead that I have over other players in the marketplace.

(*Id.* at 71.)   In making this finding as to Medco's purpose in attempting to prevent Mr. Marinelli from leaving Medco to join Coventry, the Court does not mean to impugn in any way Medco's or its employees' motives; to the contrary, such competitive thinking makes for smart business.

14

But, as discussed below, an employer's interest in stifling competition cannot justify enforcement of a non-complete clause under New Jersey law.

## II.     Conclusions of Law

### A.     Legal Standard

Ordinarily, to obtain a preliminary injunction under Federal Rule of Civil Procedure 65, a movant—here, Medco—must demonstrate "(1) that [it] will suffer irreparable harm absent injunctive relief, and (2) either (a) that [it] is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them fair ground for litigation, and that the balance of hardships tips decidedly in [its] favor." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks omitted).  In this case, however, Medco "must make a 'clear' or 'substantial' showing of a likelihood of success [because] (1) the injunction sought will alter, rather than maintain, the status quo—*i.e.*, is properly characterized as a 'mandatory' rather than 'prohibitory' injunction." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996); *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990) (observing that where an injunction goes beyond the preservation of status quo, it requires "a more substantial showing of likelihood of success").  Because Mr. Marinelli was working at Coventry before the initiation of this lawsuit, the requested preliminary injunction would alter the status quo by requiring him to cease his current employment.  Medco must therefore make a clear or substantial showing that it is likely to succeed on the merits. *Jolly*, 76 F.3d at 473.[13]

---

[13] The Court acknowledges that there may be cases in which imposing the heightened burden for mandatory injunctions on the employer would encourage gamesmanship by rewarding employees who breached their non-compete agreements by jumping ship and signing up with a competing employer before the former employer could reach the courthouse.  But this is not such a case.  Mr. Marinelli gave his notice to Medco that he was resigning and planned to join Coventry.  (*See* Hr'g Tr. at 91-93, 182-83.)  His last day at Medco was January 18, 2013.  Aware that Medco objected to his move, he sought a declaratory judgment by complaint dated

**B.     Likelihood of Success on the Merits**

Both parties agree that New Jersey law governs this dispute, as a result of the choice-of-law provision in Mr. Marinelli's employment contract.  (Ex. 508.)  Under New Jersey law, a covenant not to compete will be enforced only to the extent it is "reasonable under the circumstances." *Solari Indus. v. Malady*, 55 N.J. 571, 585 (1970).  A non-compete clause is reasonable insofar as it is "[1] reasonably necessary to protect [an employer's] legitimate interests, [2] will cause no undue hardship on the [employee], and [3] will not impair the public interest."  *Id.*[14]  Medco largely overlooks an essential component of the *Solari* standard— namely, that the covenant not to compete must be *reasonably necessary* to protect the employer's legitimate interests.  Mr. Marinelli is already subject to an independent contractual obligation not to disclose confidential information (*see* Ex. 508 ("Covenant Against Use and Disclosure")), and Medco has failed to establish facts that demonstrate that this non-disclosure provision is insufficient to protect its legitimate business interests.  Furthermore, Medco's

---

February 6, 2013 asking for a judicial declaration as to whether he could continue working at Coventry.  Notwithstanding, Medco's opportunity to bring suit before Mr. Marinelli began his new job, it was only after Mr. Marinelli started working at Coventry and filed suit that Medco sought injunctive relief, on February 15, 2013.

[14] New Jersey courts do not give much consideration or weight to the third prong of the *Solari* test—whether the non-compete clause impairs the public interest—because they recognize that "competing public interests" are already at stake in the first prong.  *See Campbell Soup*, 58 F. Supp. 2d at 489. Enforcing non-compete covenants serves the public interest in "safeguarding fair commercial practices and . . . protecting employers from theft of piracy of trade secrets, confidential information or . . . knowledge and technique in which the employer may be said to have a proprietary interest," but enforcing such covenants harms the public interest in "fostering creativity and invention and in encouraging technological improvement and design enhancement of all goods in the marketplace."  *Id.*  In this case, consideration of these competing interests is subsumed in the Court's analysis of the first *Solari* factor, i.e., whether the non-compete clause is "reasonably necessary to protect the employer's legitimate interests."  *Solari*, 55 N.J. at 585.  It is unnecessary to address separately the "public interest" prong.

motivation in seeking to enforce the non-compete clause is to stifle competition, which is not a legitimate interest that can justify the use of a covenant not to compete.

An "employer has no legitimate interest in preventing competition as such," *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33 (1971), and New Jersey courts will therefore refrain from enforcing "a restrictive agreement merely to aid the employer in extinguishing competition . . . from a former employee." *Campbell Soup*, 58 F. Supp. 2d at 489.  Courts will, however, enforce a non-compete clause where doing so is necessary to protect an employer's legitimate interests— such as an "employer's interest in protecting trade secrets, confidential information, and customer relations." *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 628 (1988).  The New Jersey Supreme Court further recognizes that "employers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment."  *Id.* at 638 (internal quotation marks omitted).

### 1. The Non-Compete Clause Is Not Reasonably Necessary to Protect Medco's Legitimate Interests

Medco relies on a formulaic reading of New Jersey law, arguing that if (1) an employee was exposed to confidential information and (2) that employee seeks to take a job in the same industry, i.e., in an industry in which the confidential information could be used, then the non-compete clause is, *ipso facto*, reasonably necessary to protect Medco's legitimate business interests.  Applying this standard, Medco asserts that the non-compete clause must be enforced because Mr. Marinelli was exposed to confidential information and has joined a competing firm in the same industry that could use the confidential information to Medco's detriment.

Such a mechanical standard, however, does not find an adequate basis in the New Jersey case law Medco cites. In *Campbell Soup Co.*, 58 F. Supp. 2d at 492-93, a district court allowed Campbell Soup Company to enforce its non-compete agreement against a high-level advertising executive who sought to become chief marketing officer at Pillsbury, maker of Progressive Soup, i.e., a competitor of Campbell's Soup. *Id.* at 485, 487. Unlike Mr. Marinelli, the employee in *Campbell Soup* was intimately involved in creating confidential advertising and business strategy that would be highly useful to the new employer he sought to join. *Id.* at 483-84. At his new job, the defendant-employee would have been responsible for "advertising and creating strategies for brand acceptance of Pillsbury's products, including those that compete with Campbell's brands in which [the defendant-employee] has sensitive competitive and trade secret information." *Id.* at 485. Put another way, the confidential information from the advertising executive's old job—which included his own analysis and evaluation of Campbell's past advertising and development of Campbell's confidential brand positioning statements—would be highly useful to him in his new job because, armed with Campbell's strategic information, he would know how to tailor Pillsbury's advertising to outmaneuver Campbell's. In addition, the court emphasized that attempts to insulate the executive from making decisions concerning Pillsbury products that competed with Campbell's products—leaving him free to perform his job as to other Pillsbury products—were not feasible because Campbell's had demonstrated that the executive was untrustworthy. *See id.* at 487 ("[T]o insulate [the executive] at Pillsbury from duties dealing with Progresso . . . would require a great measure of trust that he could comport his conduct to the requirements of the non-compete clause. . . . [Some of the executive's past behavior] shows bad judgment, while the explanations show a dissembling trait that undermines trustworthiness in observing duties of loyalty."). Simply put, the facts in *Campbell Soup*

18

demonstrated a significant likelihood that the employee would use the employer's proprietary information in his new job, and that lesser measures—e.g., limiting his job responsibilities—were insufficient because the employee was dishonest and could not be trusted to adhere to such limitations.[15]

Medco also cites *National Reprographics, Inc. v. Strom*, in which the district court granted a preliminary injunction enforcing a non-compete agreement that barred the defendant-employee from working for any competitor within fifty miles of one of plaintiff's branches for one year after the termination of his employment.  621 F. Supp. 2d 204, 208, 211 (D.N.J. 2009).  *National Reprographics* is distinguishable, however, in two key respects.  First, by virtue of the defendant's job responsibilities with the plaintiff, the defendant was well acquainted with—rather than merely exposed to—confidential pricing information.  Before departing from his job with the plaintiff–reprographics company, the defendant was "very involved in setting pricing and determining pricing methods for customers . . . ."  *Id.* at 214; *see also id.* at 226 ("[The plaintiff] came into a key position that of necessity would expose him to sensitive . . . information.").  Second, this proprietary pricing information would plainly be useful to the employee in his new role with the competing reprographics firm at which he planned to work—responsibilities that included participating in business strategy development, an activity for which knowledge of a competitor's pricing strategy would be very useful.  *See id.* at 220 (quoting the competitor's job proposal, which described one job responsibility as "[identifying] key new targets for our existing products/services and work[ing] with corporate management to develop a strategy to capture this additional business."); *id.* at 226-27.

---

[15]  In addition, the court in *Campbell Soup* found it quite significant that the contract contained a "safety net" that compensated the employee for the duration of the non-compete clause.  *See infra* Section II.B.2 (analyzing the undue-hardship prong of the *Solari* test).

*Campbell Soup* and *National Reprographics*[16] found that non-compete clauses were enforceable where the employee not only had an in-depth familiarity with confidential information partly as a result of being involved in creating that information, but also accepted a position with job responsibilities for which the confidential information would be useful.  To enforce a non-compete clause in the absence of these two factual predicates—as Medco urges— would run counter to the *Solari* reasonableness requirement.  Non-compete covenants must be "reasonably necessary to protect [an employer's] legitimate interests," *see Solari*, 55 N.J. at 585, and where the risk that a company's confidential information will be disclosed or used is merely negligible, enforcing a non-compete covenant would be unreasonable.

Taken to its logical extreme, Medco's "mere exposure" argument would bar any employee who was subject to Medco's non-compete agreement and was exposed to confidential information at any time from taking a job—even the position of janitor—at any firm in the same industry.  The plain terms of Medco's "Key Employee" agreement would support such a sweeping prohibition, stating that

---

[16] Medco also directs the Court's attention to *Medco Health Services, Inc. v. Courtman*, No. C-323-12 (N.J. Super. Ct. Jan. 9, 2013), a New Jersey Superior Court decision issuing a preliminary injunction based on the court's conclusion that a non-compete clause, which had wording identical to the one at issue here, was reasonable as applied to the defendant-employee. (*See* Countercl. Pls.' Am. Proposed Findings of Fact and Conclusions of Law [Dkt. # 56] at 10.) *Courtman*, however, has little persuasive value.  First, *Courtman* is factually distinguishable. The defendant-employee against whom Medco sought to enforce the non-compete clause was the Senior Vice President of Pharmacy Network Management—a job that is far more senior than Mr. Marinelli's job at Medco.  *Courtman*, No. C-323-12, at *2.  And the defendant-employee left to become the *president* of a competing firm.  *Id.*  Second, the Court finds the reasoning in *Courtman* unpersuasive, not least because the five-page order granting a preliminary injunction does not cite a single case or include any analysis of whether the plaintiff would actually be harmed by the defendant-employee's actions.  Instead, the decision issuing the preliminary injunction states in conclusory fashion that the scope of the covenant is "reasonable" and that "[r]easonable restrictive covenants are enforceable precisely because the harm high level former employees can visit upon their former employees [sic] is not readily susceptible to, or remediable by, monetary calculation."  *Id.* at *4.

> [F]or a period of twelve (12) months following the termination of [his] employment, [Mr. Marinelli] will not (as an individual, principal, agent, employee, consultant, or otherwise), directly or indirectly in any territory in which the Employer and/or any of its affiliates does business and/or markets its products and services, engage in activities competitive with, nor render services to any firm or business engaged or about to become engaged in the Business of the Employer.

(Ex. 508.)  Adopting a literal reading of the agreement to impose such a result—foreclosing the employee from working as a janitor for the other firm—would not, however, be reasonably necessary to protect the employer's legitimate interests.  There is little risk that, as a janitor, the employee would disclose her former employer's confidential information, as her job responsibilities would not call on her to use that information.  That is not to say that there is no risk of disclosure; the janitor could always affirmatively decide to share information with another employee.  Nonetheless, even Medco conceded that the agreement would be unenforceable in such a situation.  (Hr'g Tr. at 233 (discussing janitor hypothetical).)  Mr. Marinelli's position at Coventry is hardly that of janitor.  But Medco has failed to demonstrate that, in light of his mere exposure to confidential information while he was at Medco, the differing responsibilities between his two jobs, and the limited competitive overlap between the two companies, there is a materially greater risk of disclosure of confidential information than in the janitor scenario.

To properly evaluate this risk—that is, to decide whether this case is more like the janitor hypothetical or more like *Campbell Soup* and *National Reprographics*—requires specifics, and as it is Medco's motion, Medco bears the burden of identifying specific protectable information for which there is some non-negligible risk of disclosure or use.  Merely identifying confidential information to which Mr. Marinelli was exposed is insufficient; Medco must make a clear or substantial showing of some risk that Mr. Marinelli will disclose or use protected information at Coventry.  *See Jolly*, 76 F.3d at 473; *Solari*, 55 N.J. at 585.

21

Medco has failed to meet this burden.   As discussed below, all of the protectable information identified by Medco—with the exception of compliance procedures—falls into two largely overlapping categories: (1) information that Mr. Marinelli was merely exposed to and does not remember; and (2) information that has no bearing on Mr. Marinelli's current job with Coventry.   Information in the first category is not at risk of disclosure or use for the obvious reason that Mr. Marinelli cannot use or disclose what he does not remember.   Information in the second category is similarly safe from use or disclosure because, much like in the janitor example, Mr. Marinelli's job responsibilities at Coventry do not raise a realistic threat that he will disclose or use the protected information.   Further, Mr. Marinelli is under an independent obligation—by contract and by order of the Court—not to disclose protected information.[17] Even Medco's witnesses agreed that Mr. Marinelli is a "man of integrity" (Hr'g Tr. at 55.), and the Court is aware of no reason to expect that he will violate his legal obligations.   Accordingly, there is no need for additional protection from a non-compete clause.

### i.        Information to Which Mr. Marinelli Was Merely Exposed

In this first category of confidential information, the Court includes some of Medco's customer lists, Medco's business plans, and Medco's strategy for bidding for contracts to sell individual PDPs.   The Court finds that Mr. Marinelli's exposure to this information while at Medco was minimal.   As the Senior Director of Member Enrollment, Billing, and Reconciliation at Medco, Mr. Marinelli managed operations related to compliance with Medicare Part D requirements.   This job did not require Mr. Marinelli to work intimately with information relating to customers, strategic planning, or Medco's bid strategy.   He did not create, compile, or

---

[17] Coventry took additional steps to ensure that Mr. Marinelli would not disclose Medco's protectable information.   First, Ms. Cocozza instructed Mr. Marinelli not to share any such information.   (Hr'g Tr. at 225.)   Second, in its discussions with Medco, Coventry offered to wall Mr. Marinelli off from specific job responsibilities.   (*Id.* at 224.)

work with this information on a daily basis.  To the extent that Mr. Marinelli was exposed to specific protectable information relating to customers, strategic planning, or bid strategy, he does not specifically recall it.  Referring to the terms of the stipulated temporary restraining order,[18] Mr. Marinelli testified that of the confidential information enumerated in the order, he was exposed to "very little" and that he remembers "virtually none of it."  (Hr'g Tr. at 185-86.)[19] The Court credits this testimony.  Mr. Marinelli's credible testimony that he remembers "virtually none" of the confidential information recited by Medco, in tandem with the fact that his job at Medco did not require him to work with the information closely, is sufficient to establish that the non-compete covenant is not a reasonable prophylactic to safeguard Medco's confidential information.

### ii.    Information Unrelated to Mr. Marinelli's New Job

Even for protectable information with which Mr. Marinelli had some familiarity by virtue of his job at Medco—in this category, the Court includes Medco's EGWP-customer pipeline, components of its EGWP strategy, its bid strategy, and proprietary information regarding vendor management—the risk of disclosure is negligible because Mr. Marinelli's new responsibilities at Coventry would not be furthered by his using the information in the event that

---

[18] The order defines confidential information as follows: "(i) strategy for growing its prescription drug plan business, including its objectives, plan design, and capital projects; (ii) prescription drug plan clients, including the customer pipeline; (iii) development, marketing or sale of the Company's products or services, including product and service pricing, pricing strategy, and risks and opportunities to grow the business, (iv) budgets, including outsourcing budgets, forecasts, and modeling; (v) actual and prospective business transactions, including bidding strategies; (vi) formulary strategy; (vii) benefit design; (viii) financial results; and (ix) margins and margin targets."  (Stipulation and Order [Dkt. # 38] at 1-2.)

[19] Mr. Marinelli also testified, and the Court finds, that he does not have in his possession any confidential materials. (Hr'g Tr. at 185.)  Medco offered no evidence suggesting otherwise.

he actually remembers it.[20]   As Vice President of Medicare Operations for Coventry, Mr. Marinelli is responsible for ensuring that Coventry's PDPs comply with Medicare Part D requirements.  He does not assist with the marketing or sales of Coventry's PDPs, rendering Medco's customer information useless.  Mr. Marinelli is not "in charge of anything related to the actual bid, the pricing," such that Medco's bid strategy has no significance to Mr. Marinelli's job.  And in any event, information relating to Medco's EGWP business is essentially immaterial because Coventry primarily sponsors individual PDPs.[21]   With respect to vendor-management information, as Coventry does not employ any outside vendor to perform compliance operations, any proprietary business process involving vendor management is not threatened by Mr. Marinelli's job with Coventry.  In short, Medco has failed to show that Mr. Marinelli's new role with Coventry entails a significant risk that confidential information will be used.  Under these circumstances, enforcing the non-compete clause is not "reasonably necessary" to protect Medco's legitimate interests in safeguarding its confidential information.  *Solari*, 55 N.J. at 585.

### iii.    Compliance Procedures

Nor can the non-compete clause be justified as a reasonable protection of Medco's processes, procedures, and business methods for complying with CMS's regulations or obtaining a high Star Rating.   Medco has not made a sufficient showing that its information about compliance methods is protectable in the first place.  *See Jolly*, 76 F.3d at 473 (movant must

---

[20] Although Mr. Marinelli worked with this information, he did not create the most sensitive parts of it—such as pricing strategy—and his use of this information was limited to that which was necessary to support his oversight of Medicare operations.

[21] The fact that Coventry might merge with Aetna does not change the Court's analysis because the timing of the merger is speculative, and there is insufficient evidence in the record regarding (1) Aetna's business model with respect to EGWPs, individual PDPs, and vendor outsourcing, and (2) how, if at all, Mr. Marinelli's role would change if the merger is completed. *See supra* note 4.

make a "clear or substantial showing").  There is good reason to believe that it is not.  First, Medco regularly shared this information with Coventry and its other PBM clients.  Second, Medicare regulations are public information, and much of what Medco characterizes as proprietary appears to be little more than operational common sense within the industry.  *See Whitmyer*, 58 N.J. 25 at 33-34 ("[M]atters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection nor will routine or trivial differences in practices and methods suffice to support restraint of the employee's competition.").  Third, when pressed to do so at the hearing, Medco could identify only one specific example of a process that it regarded as competitively sensitive (*see supra*, page 11 (discussing Mr. Pim's example about avoiding late-enrollment penalties)), and Medco never suggested that even this information was not shared with Coventry or its other PBM customers.  Indeed, Ms. Cocozza's testimony strongly suggested that Coventry and other such customers fully expected Medco to share this and other ingredients of its so-called "secret sauce," as this was what these customers were paying for.  (*See* Hr'g Tr. at 140-41.)  Finally, even if Medco's business processes relating to Medicare compliance were confidential, the rapid pace at which CMS issues new regulations and guidance likely renders these processes largely obsolete—and therefore unnecessary to protect.

Especially in light of the clear evidence that Medco was motivated primarily by a desire to limit competition, the Court declines to enforce a non-compete agreement that does not clearly protect legitimate business interests.  *See Ingersoll-Rand*, 110 N.J. at 635 (New Jersey courts "will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee" because "knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's

person," and the former employee may "use those skills in any business or profession he may choose, including a competitive business with his former employer").

### 2.    Hardship on Mr. Marinelli

A covenant not to compete is only reasonable if it "imposes no undue hardship on the employee." *Solari*, 55 N.J. at 576.  In determining whether a non-compete covenant would impose undue hardship, a court should consider "the likelihood of the employee finding work in his field elsewhere." *Karlin v. Weinberg*, 77 N.J. 408, 423 (1978).  The New Jersey Supreme Court further explained that:

> The trial court should examine also the reason for the termination of the relationship between the parties to the employment contract. Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as "undue" in that the employee has not, by his conduct, contributed to it.  On the other hand, where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself. Ordinarily a showing of personal hardship, without more, will not amount to an "undue hardship" such as would prevent enforcement of the covenant.

*Id.* at 423-24.

Mr. Marinelli will suffer hardship if the non-compete clause is enforced against him.  To begin with, the covenant not to compete is broad enough that it would operate to bar Mr. Marinelli from "finding work in his field [, i.e., Medicare Operations,] elsewhere." *Id.* at 423. (*See also* Key Employment Agreement, Ex. 508 (prohibiting Mr. Marinelli from "(as an individual, principal, agent, employee, consultant, or otherwise), directly or indirectly in any territory in which [Medco] and/or any of its affiliates does business and/or markets its products and services, engag[ing] in activities competitive with, nor render[ing] services to any firm or business engaged or about to become engaged in the Business of [Medco]").  And while Mr.

26

Marinelli earned a six-figure salary each of the past few years and is certainly not in dire financial straits, he is nevertheless the sole breadwinner for a family with three children who have not yet attended college.  (Hr'g Tr. at 183-84.)  Furthermore, Mr. Marinelli's non-compete clause does not have a "safety net" provision to mitigate the financial consequences to Mr. Marinelli of being barred from pursing work in his field.  The absence of such a safety net distinguishes Mr. Marinelli's situation from that in *Campbell Soup*, where the court found that the safety net in the non-compete clause at issue in the case was material to the reasonableness of the non-compete clause because it lessened the employee's hardship.  *Campbell Soup*, 58 F. Supp. 2d at 490 ("Further reasonableness is found in the "safety net" provision, which cushions the financial loss to the departing employee and which negates any intent to impose a punishment upon him.").[22]

Mr. Marinelli voluntarily resigned his position with Medco, a fact that ordinarily militates against a finding of undue hardship.  *See Karlin*, 77 N.J. at 423-24; *see also Nat'l Reprographics*, 621 F. Supp. 2d at 228 ("Where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee.").  Here, however, Mr. Marinelli's resignation was prompted by significant layoffs at Medco's New Jersey office, which threw Mr. Marinelli's job security into question.  As Mr. Marinelli testified:

> There have been substantial layoffs in the New Jersey office. I have a feeling --
> and in the corporate offices of Franklin Lakes and Montvale, I believe that the
> amount is somewhere from 30 to maybe 50 percent of staff let go. And so I

---

[22] The contract in *Campbell Soup* included a "'safety net' in case [the employee was] unable to find employment with a non-competitor. [The employer] agree[d] in this safety net to pay 100% of his base monthly salary (along with medical and dental benefits) beginning 90 days after his last employment . . . and continuing for the 18-month duration of the non-competition provision or until he finds a suitable position."  *Campbell Soup*, 58 F. Supp. 2d at 482.

certainly feared for my job. Also, after my resignation there was published reports
of significant salary reductions and that was clearly a fear.

(Hr'g Tr. at 164.)  Although "a court should be hesitant to find undue hardship" for an employee

who chose to end her prior employment relationship, *see Karlin*, 77 N.J. at 423-24, the Court

believes that it would be inequitable to penalize an employee when he decides to leave based on

reasonable uncertainty about future job security.  The Court therefore finds that Mr. Marinelli's

non-compete clause is also unenforceable because it imposes an undue hardship on Mr.

Marinelli.

### III.    Conclusion

For the reasons stated above, Medco's Motion for Preliminary Injunction [Dkt. # 16] is

GRANTED IN PART and DENIED IN PART.

As Mr. Marinelli has agreed to abide by the Stipulation and Order [Dkt. # 38] currently

in place (Pl.'s Stipulations of Fact and Conclusions of Law [Dkt. # 53] ¶ 62), the Court hereby

maintains the injunction until this case is resolved.  Specifically, it is HEREBY ORDERED that

Joseph Marinelli, and any person or entity in active concert or participation with him, shall not

directly or indirectly use or disclose to any person or entity any Confidential Information—

defined below—of Medco Health Solutions, Inc., its parent, subsidiary, sister, or other affiliated

entities (collectively the "Company") learned by Mr. Marinelli in the course of his employment

with the Company.  Confidential Information means information that is not readily available in

the public domain or industry. It includes information regarding the Company's: (i) strategy for

growing its prescription drug plan business, including its objectives, plan design, and capital

projects; (ii) prescription drug plan clients, including the customer pipeline; (iii) development,

marketing or sale of the Company's products or services, including product and service pricing,

pricing strategy, and risks and opportunities to grow the business; (iv) budgets, including

outsourcing budgets, forecasts, and modeling; (v) actual and prospective business transactions, including bidding strategies; (vi) formulary strategy; (vii) benefit design; (viii) financial results; and (ix) margins and margin targets. Confidential Information does not include information that is readily available in the public domain or industry or Marinelli's general knowledge, skills, or information common to Marinelli's trade or profession.

In all other respects, Medco's motion for a preliminary injunction is denied. Finally, the parties' Rule 26(f) Report shall be filed within fourteen days of this Memorandum of Decision.


IT IS SO ORDERED.


  /s/
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              June 13th, 2013


29